**KRAWILL MACHINERY CORPORATION, a Michigan corporation, Kraus Manufacturing Corporation, a Michigan corporation, Engineering Industries International, S.A., a corporation,**

v.

**ROBERT C. HERD & COMPANY, Inc., a Maryland corporation, Bethlehem Steel Company, a Delaware corporation.**

Civ. No. 8117.

United States District Court
D. Maryland, Civil Division.
Sept. 26, 1957.

Ober, Williams, Grimes & Stinson, Baltimore, Md. (William A. Grimes, Baltimore, Md., of counsel), and Fildew, DeGree, Fleming & Gilbride, Detroit, Mich. (Leslie W. Fleming, Detroit, Mich., of counsel), for plaintiffs.

Lord, Whip & Coughlan, Baltimore, Md. (George W. P. Whip and Robert E. Coughlan, Jr., Baltimore, Md., of counsel), for Robert C. Herd & Company, Inc.

Semmes, Bowen & Semmes, Baltimore, Md. (William D. Macmillan and William A. Fisher, Jr., Baltimore, Md., of counsel), for Bethlehem Steel Co.

THOMSEN, Chief Judge.

The former opinion in this case, 145 F.Supp. 554, stated my reasons for concluding: (1) that negligence on the part of the stevedore, Robert C. Herd & Company, Inc., was responsible for dropping into Baltimore harbor a crate containing a heavy press and other items, and (2) that the stevedore was not entitled to the $500 limitation of liability which the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., provides for a ship and its owners. The questions now before the court are: (a) the amount of damages recoverable, and (b) the party or parties entitled to recover those damages.

### Findings of Fact

W. H. Kraus owns or controls all of the stock and is the president of (1) Krawill Machinery Corp., of Michigan (Krawill), which trades in second-hand machinery, (2) Engineering Industries, Inc., of Michigan (E. I. Inc.), which manufactures tools and dies, and (3) Engineering Industries International, S.A., a Tangier corporation (E. I. Int'l), which undertakes contracts to build plants in Spain and elsewhere, furnishes the engineering services, and subcontracts the other work. Kraus also owns

60% of the stock and is president of Kraus Manufacturing Co., of Michigan (Kraus Mfg.), which, until the spring of 1954, was engaged in manufacturing tools, die parts, and the like.

In 1953, Comercio, Industria y Transportes, S.A., of Spain (Cointra), had a contract with the United States Army to manufacture and supply in Spain a considerable quantity of land mines. Through Low Shaw & Co., Inc., of Paris (Low Shaw), Cointra entered into a contract with E. I. Int'l to supply and install at Cointra's plant at Puzol, near Valencia, Spain, the machinery necessary to produce such land mines. In the final letter, which was accepted by Low Shaw on behalf of Cointra, E. I. Int'l stated:

"We herewith submit our quotation for dies, tools and gages (sic) as outlined on attached 21 sheets on your M6A2 Land Mine contract.

"Our price includes design, build and tryout on our facilities, dies to be production type to meet suitable press requirements.

"* * * [High quality of presses, dies, etc. specified] * *

"You are to furnish at our facilities qualified personnel whom we will thoroughly acquaint with this programme. This personnel shall be responsible for running production and inspection of this job.

"Sample parts to be approved by our personnel prior to shipment. We will supply sample parts to you for inspection at your plant.

"Technical assistance in Europe until date included in price. We also agree to supply one engineer for two weeks from date at our cost. Also we will supply one qualified technician for two weeks to act in an advisory capacity in setting up production of these tools in your plant.

* * * * * *

"Delivery will be made piecemeal in single or families of tools on a given part."

With Kraus acting on behalf of all parties, E. I. Int'l contracted (a) with Krawill to supply four presses, including the 100-ton Clearing press involved in this action, (b) with Kraus Mfg. to produce the necessary die parts, attachments, etc., and (c) with E. I. Inc. to prove the dies and to make the pilot runs necessary to produce the sample parts for 100 mines called for by the contract with Cointra. Seven other presses were purchased in Europe.

After the four presses had been obtained by Krawill and the dies and attachments had been manufactured, the tests were made and the sample parts were produced in Michigan. Thereafter, all of the machinery, attachments, die parts, and sample parts were crated and packed into cases at E. I. Inc.'s plants in Detroit, and were turned over to agents for shipment by rail and water to Spain. In the crate with the 100-ton Clearing press were packed certain die parts, some of the sample parts for the land mines, and a spare crankshaft for one of the other presses. The proof of what die parts and sample parts were packed in that crate is not satisfactory, but when depositions were taken in Michigan, Herd's counsel accepted without objection five shipping invoices (Pl. Ex. 9) to show, in his own words, "that the other items on pages 2, 3, 4 and 5 were packed with the 100-ton press". In view of that statement by Herd's counsel, plaintiffs' counsel may be excused for not offering further proof of those items. There is other substantial additional evidence of many of the items.

Immediately after the case dropped into the waters of Baltimore harbor on the afternoon of April 14, 1954, Kraus was notified, and he arrived in Baltimore that evening. The press had been lifted out of the water, and some of the other contents of the case were recovered during the next day or two. Many of the attachments on the press had been torn off; all of its parts, including the gears in the gear case, had been exposed to brackish water for at least four hours; the visible unpainted parts already showed some corrosion; and there was evidence of damage to the nut around one

of four massive bolts, which indicated an impact sufficient to disturb the delicate adjustment of the internal mechanism of the press. Many of the die parts and sample parts which were recovered showed corrosion or damage or both. Herd made some effort to prevent further corrosion by having the press and the other material cleaned and treated, but the effort was only partially successful.

The press and the other material recovered from the river were shipped back to the E. I. Inc. plant in Detroit by rail. At whose instance this was done was not proved; the bill was paid by the insurance company which had issued an inland marine policy on the press.

Kraus flew to Spain promptly, explained the situation to Cointra, and showed them some photographs, which were offered in evidence. Cointra refused to accept the press because of the nature of the damage it had sustained. Kraus attempted to find a replacement in Europe, without success, and Cointra did not find a replacement for several months.

In the meantime, Kraus secured an estimate for repairing the obvious damage to the press. The estimated cost was $10,000, plus $200 cartage, with no guarantee that the press would operate satisfactorily after the repairs were made. The value of similar presses in the second-hand machinery market was around $10,000. All witnesses on the subject testified that it would have been an unwise economic decision to attempt to repair the press, and that it had only a salvage value. The highest salvage value given was $500 net. I accept this evidence.

Under the contract with Cointra, E. I. Int'l would have received $20,433, c. i. f. Valencia, for the press, including the new attachments which had been added. The $20,433 was equivalent to $18,790 at Baltimore, including packing and freight from Detroit.

It was necessary for plaintiffs to replace the lost or damaged die parts and sample parts as soon as possible to avoid claims for delay by Cointra. Kraus Mfg. was already out of business, so Kraus arranged to have the die parts made by E. I. Inc. Since all of the other presses and die parts were already in Spain, it was necessary to prove and test the new die parts there. The work in Spain included: (1) try-out of the replacement die parts and attachments, (2) reassignment of 80–90% of the dies among the remaining ten presses then in Spain, to make up for the lost eleventh press, and (3) a new pilot run. To accomplish this work it was necessary to send engineers from Detroit to Spain, since there were no available engineers in Spain with the requisite know-how. While Spanish operators could and did operate the presses after receiving instructions, it was necessary to have experienced engineers to supervise the pilot run.

██ Sending engineers to Spain required payment of their air travel expenses, their living expenses, and their salaries. The travel expenses included excess baggage charges for carrying the new die parts. Three of the engineers travelled air coach and one first class. Two of the three received in cash the difference between air coach and first class fares. Under these circumstances plaintiffs should not recover more than air coach fares. Salaries should be allowed at the rate actually paid each man, not the so-called "value" contained in the amended bill of particulars. Properly calculated, the engineering expense amounted to $14,291.22.

█ Under the Cointra contract, E. I. Int'l was required to furnish one engineer at Puzol for two weeks. Plaintiffs have therefore eliminated the travel expense incurred by Kraus on his second trip to Spain, and fourteen days of his time; they claim at $150 per day for all of his time over fourteen days. Kraus was a competent engineer, but he was paid no salary by any of plaintiff corporations for these services, and no salary at all by most of them. No salary for Kraus should be allowed, but his expenses on his trip to Baltimore and on

his first trip to Spain are proper items of damages. They amount to $64.28 and $1,072.81 respectively.

The cost of manufacturing the replacements for the die parts which were damaged or lost is difficult to determine. No cost records were kept by E. I. Inc. Its vice-president estimated the cost to E. I. Inc. of replacing those parts, including labor, material, overhead and profit, at $19,100. Kraus Mfg. and E. I. Inc. entered into a contract under which Kraus Mfg. agreed to pay that amount to E. I. Inc. if, but only if, Kraus Mfg. is reimbursed for the loss of and damage to the parts and dies by the party or parties responsible for the loss and damage. In view (a) of a false statement of the value of the 100-ton press given by or on behalf of Kraus to the insurance company which issued the inland marine policy, and (b) of padded claims made by Kraus and his companies, I cannot accept $19,100, or even $19,100 less a profit of 10 or 15%, as the fair cost of such repairs. Undoubtedly they cost a substantial amount; but for the reasons stated, and because of the generally unsatisfactory character of the testimony and other evidence offered by plaintiffs on this issue, I find the reasonable cost of manufacturing the replacements for the lost dies and die parts to have been $12,000.

The lost crankshaft was worth $1,275.

Overseas telephone calls and cables made necessary by the accident amounted to $998.03.

Counsel for Herd agreed at the trial that it would not be necessary for plaintiffs to show which items of damage were properly collectible by the several plaintiffs, but that Krawill, individually, and as assignee of the other plaintiffs, may recover any damages which might properly be recovered from Herd by any of the plaintiffs, including the reasonable cost to E. I. Inc. of manufacturing the replacement dies and parts. In this way Herd avoided the possibility of being held for the full price Kraus Mfg. had agreed to pay E. I. Inc. The result of this agreement relieves counsel and the court of much time and effort, and is fair to all parties.

## Discussion

The Restatement of the Law, Torts, sec. 927 states:

"Where a person is entitled to a judgment for the conversion of a chattel or the destruction of any legally protected interest in land or other thing, the damages include

"(a) the exchange value of the subject matter or the plaintiff's interest therein at the time and place of the conversion or destruction, or a different value where that is necessary to give just compensation, and

"(b) the amount of any further loss suffered as the result of the deprivation, and

"(c) interest from the time at which the value is fixed or compensation for the loss of use."

Counsel for Herd contend that Krawill is not entitled to the profit it would have received upon delivery of the press to Cointra, pursuant to the contract, but that the award should be limited to the cost of the press to Krawill or the value of similar presses in the United States. The applicable law, however, clearly recognizes the right of a plaintiff to recover the contract price. Illustration 1 to sec. 917 of the Restatement is as follows:

"1. A negligently damages B's goods which B is on the way to deliver to C who has agreed to pay for them a price far above their market value. B is unable to obtain other goods to satisfy his contract with C. A is liable to B for the profit which he would have made."

■■ The die parts and sample parts lost or damaged in the accident had no market value, and no separate prices were fixed for them in the contract with Cointra. The fair measure of damages, therefore, is the reasonable cost to plaintiffs of replacing those parts, including: the initial cost of remanufacturing the die parts in Detroit, the reassignment of the dies among the presses then available

in Puzol, the try-out there of the replacement parts and attachments, and the making of a new pilot run. Counsel for Herd contend that some of those items are expenses for which it should not be held liable, but they cite no authorities in support of their contention. On the contrary, the great weight of modern authority holds that a plaintiff may be granted recovery in a tort action for all damages which result from an accident, even though the exact injuries constituting such damages could not have been foreseen by the negligent defendant. The Restatement of Torts, sec. 435 (1948 Supp.), reads:

"§ 435. *Foreseeability of Harm or Manner of Its Occurrence.*

"(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

"(2) The actor's conduct is not a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm."

The consequences in this case should not be considered highly extraordinary within the meaning of that rule. There was no intervening cause and no result that was not among the hazards with respect to which the conduct was negligent. This is not a case like Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253, where the injury to the plaintiff was caused by an instrument some distance away from the package which was being handled by the railroad's employee. There is no such problem of geographical remoteness in this case. Plaintiffs' claims are based upon the loss of and damage to the contents of the very crate the longshoremen were handling. The longshoremen should have foreseen that, if they handled the crate negligently, they might cause loss or damage to any person who had an interest in its contents. Comment b to sec. 917 of the Restatement of Torts states: " * * * although a contracting party who breaks his contract in failing to supply a machine would not be liable for the damages occasioned by the shutting down of a plant in which the machine was a necessary unit unless at the time of making the contract he knew or should have known the facts (see Restatement of Contracts, § 330, Illustration 1), one who negligently destroys such a machine may be responsible for the ensuing loss although he had no reason to know in advance of the machine's importance."

Conclusion

Krawill, individually and as assignee of the other plaintiffs, is entitled to recover for the following items:

| | | |
|---|---|---|
| (1) | Loss of spare crankshaft | $1,275.00 |
| (2) | Damage to 100-ton press, less salvage | 18,290.00 |
| (3) | Remanufacturing die parts in Detroit | 12,000.00 |
| (4) | Engineering work in Spain: try-out, reassignment and pilot run | 14,291.92 |
| (5) | Expenses of Kraus to Baltimore and on first trip to Spain | 1,137.09 |
| (6) | Telephone and cable expense | 998.03 |

In view of plaintiffs' padding of their claims, interest will not be allowed before the date of judgment.

The Clerk is instructed to enter judgment in favor of Krawill Machinery Corporation against Robert C. Herd & Company, Inc., for $47,992.04.