Ronald E. GATES, Plaintiff,

v.

P. F. COLLIER, INC., a Delaware corporation, Defendant.

Civ. No. 2295.

United States District Court
D. Hawaii.

July 8, 1966.

---

Shiro Kashiwa, Kashiwa & Kashiwa, Honolulu, Hawaii, for plaintiff.

Peter M. Brown, Cadwalader, Wickersham & Taft, New York City, Alexander C. Marrack, Robertson, Castle & Anthony, Honolulu, Hawaii, for defendant.

## AMENDED DECISION

PENCE, Chief Judge.

The following constitutes the findings of fact and conclusions of law of this court:

Defendant Collier,[1] a Delaware corporation with its principal office in New York, is a publisher of books. Its set of encyclopedias in English with certain accompanying volumes are the only books involved in this case.

About 1953 plaintiff Gates, then in Japan, started selling Collier's encyclopedias in Japan under an arrangement whereby GatesCo purchased Collier's encyclopedias outright at $69 per set, FOB Hammond, Indiana—GatesCo paying all costs thereafter—under a strictly buyer-seller arrangement. GatesCo sold many sets of the encyclopedia but by the end of 1959 GatesCo was owing Collier some $68,000 on encyclopedias sold and delivered by Collier but not paid for by GatesCo.

Collier sells its books internationally and in order to straighten out GatesCo's debt as well as set up a Collier's sales branch in Japan, Gates came to New York in March of 1960 and entered into a personal contract with Collier, dated April 15, 1960, whereby Gates was to become the "Far Eastern Sales Supervisor" of Collier with his headquarters in Tokyo, Japan (actually in Gates' own GatesCo building). Gates' duties were to recruit, train, maintain and supervise a book sales organization to sell Collier's books, as well as collect accounts and supervise sales of Collier's books. The salesmen were not employees of Collier.

The sales territory of the Japan division of Collier was the Empire of Japan, South Korea, Taiwan, etc. Orders obtained by Gates and his sales personnel were to be forwarded to Collier in New York for acceptance by Collier, there. All monies received from sales to Japanese civilians and schools (yen accounts) were to be deposited by Gates in Collier's account in the First National City Bank, Tokyo branch. All dollars received from American Military (servicemen) were to be sent directly to New York.

Gates was to get 34% of the net sales price of all orders accepted and if 50% of the purchase price was paid within 15 months after acceptance by Collier of an order, Gates was entitled to 7% more. If the gross sales during a 12-month period from the date of the contract or in any successive 12-month period thereafter equalled $1,000,000, Gates was entitled to 2% more. If it were but $500,000 during such period, then Gates would get but 1%. For cash sales, Gates was allowed either to give to the purchaser a 5% discount or keep 5% himself.

It was contemplated by both parties that there might be losses on account of bad accounts—Collier expecting a loss of 12.5% on the total amount of accepted orders. In order to induce good,

---

1. After the beginning of the relationships between defendant, P. F. Collier, Inc., and plaintiff in 1953 and even after suit was started, there have been corporate name changes, but the defendant's rights and obligations under its contracts with plaintiff Gates have remained unchanged. Herein, the defendant will simply be called "Collier". Plaintiff will be called "Gates" and plaintiff's Japanese, "family", corporation, R. E. Gates & Son Company, Ltd. will be called "GatesCo".

collectible business, on 24-month contracts a monthly analysis would be made 30 months from the month in which the business was reported, and on a 12-month contract—15 months. If a contract was not paid in full at the end of either 30 or 15 months, it was classified as a loss. If the losses were below 12.5%, Gates was to get the difference between the 12.5% and the actual percentage loss ratio incurred. If the actual loss ratio exceeded 12.5%, Gates was to pay Collier the difference between 12.5% and the actual percentage of loss over that figure.

Practically simultaneously with the execution of the agreement, Collier prepared for Gates an "Outline of procedure for opening a Branch in Tokyo, Japan." This "procedure" was intended to (by both parties) and did implement and interpret the contract. By that procedure, Collier was to ship, at its own expense, such books as were required for sales in Japan, to Gates' warehouse in Tokyo. Delivery to the customers in Japan was at Gates' expense. All military orders were to be shipped by Collier's New York office to the purchasers. Gates was to pay all branch operational expenses such as clerical salaries, office rent, warehousing, etc. All accounts sold by Gates in Japan were to be the accounts receivable of Collier. The Tokyo branch was to handle accounts collected there on two different bases. When yen were to be paid, it was on a 12-month contract basis, and when dollars were to be paid, the collection was on a 24-month basis. All yen received were to be deposited in Collier's "Japan Branch" account in Tokyo. Dollars collected in Tokyo were to be remitted directly to New York. The amount remitted to Collier in New York on yen collected was to be the amount as limited by Collier's Import License. Various accounts were given the following numbers:

U. S. military accounts—96B

Japanese civilian accounts—97B

Japanese schools and libraries accounts—99B

(In 1962, Australian accounts—98B)

Audits on all Japanese accounts were to be made by the Haskins & Sells representative in Tokyo. The contract also provided that GatesCo should pay its debt to Collier in the sum of $68,036.91 in monthly installments of $5,000 each commencing May 15, 1960.

So that Gates could be paid immediately the commission on the dollar accounts, Collier established an "Imprest Fund" with the Long Island Trust Company in New York, on which Gates had the power of attorney and from which he could draw to pay his sales commissions. The dollar Imprest Fund was established only for the purpose of paying commissions on sales when Collier received dollars instead of yen. Collier paid all legal, tax and other expenses for setting up the Tokyo branch of its corporation, and applied for and received a Japanese Import License so that Collier in New York could be paid for all of the books sent to the Japan office.

Collier's Import License allowed payment to Collier, out of Japan, for the "full amount of invoice covering cost of books," the sum of $172.50 per set of encyclopedias and accompanying books. The gross sale price of the set of encyclopedias with accompanying books was first fixed at $269.50.

The contract was agreed upon and drawn up in New York while Gates was there. Collier signed it in New York, and Gates signed it in Tokyo. Both parties operated under the above contract until September 15, 1961, when a new agreement was entered into whereby Gates became "Supervisor of the Asiatic Division of Collier" with the same obligations, duties, etc., but with the Republic of the Philippines added to his territory. About this time he was made a vice-president of Collier. The accounting period for the 1% and 2% bonus was put on a calendar year basis as of January 1, 1962. The loss ratio basis on sales to Japanese schools and libraries was fixed at 10%, but was again fixed at 12.5% on all other sales. This contract, like the preceding one provided that the agreement should "continue in

effect until terminated by either party on two weeks' notice, in writing, to the other of his or its election to do so."

Meanwhile, Gates, personally, had become indebted to Collier for $5,000 and this September 1961 agreement provided that Gates would pay this off at the rate of $500 per month beginning October 1, 1961.[2] In other respects this agreement was practically the same as the first one.

Towards the end of 1961, Collier and Gates decided to open up a Collier branch in Australia, and did so in January 1962. However, as to the Australian operation, it was agreed that Gates would act as an independent contractor and not as an employee of Collier and would be entitled to a 36% basic sales commission. Collier would open its own branch there to handle only the cash accounts receivable and the inventory of books, all sales to be under the control of Gates.

By March 1, 1962 however, Gates' term sales out of the Japan branch had resulted in such poor collections that Collier ordered, and Gates in writing agreed, that no sales would be made to any person in the U. S. A. Military Service whose rank was below the first three grades, or to any person under 21 years of age, and all collections on 96B (Military) accounts would be made by Collier in New York instead of from Tokyo. Collier in New York was immediately to prepare and by April 1, 1962 send out collection letters so that every subscriber of the 96B accounts would receive a notice of all changes. The change in collection procedure, however, was not to change Gates' responsibility under the agreement of guaranteeing Collier reimbursement of collection losses over 12.5%. Gates was to get nothing on special commission agreements until $70,000 had been placed in escrow, and the 12.5% collection commission on 97B yen accounts and the 7% profit share bonus on 96B accounts was frozen. Collier was to withdraw from the escrow funds such

money as was necessary to make an adjustment on the collection losses on the military accounts.

By April 1st the collection losses were so bad that Norman E. Bennett, then senior vice-president of Collier, flew to Tokyo on April 24, 1962 to make a complete study and analysis of the quality of all of the sales contracts in the Collier branch. Gates met him at the airport, drove him to the hotel, and told Bennett he had been analyzing the records and thought he knew what was wrong. Next morning Gates told Bennett that he, Gates, was exhausted as he had been up all night with the records, and asked that the analysis be postponed until Thursday morning, April 26.

On that Thursday morning, with Robert Van Arsdale, the resident partner of Haskins & Sells, Bennett went to the Collier office in the GatesCo building. Gates said that he had found out what was wrong with the Japanese civilian operation and exhibited three ledgers (Exs. B13—A, B and C) representing that his Japanese bookkeepers had contrived a system of reporting to New York only selectively the money collected; that the bookkeepers were in need of a cash flow and they had contrived this system. Gates said he had traveled so much that he had not paid proper attention to office affairs.

The bookkeeping division of GatesCo included one Allen, an American, T. Saito, a director and registered with the Japanese government as an acting manager of GatesCo, as well as three other Japanese—all of whom had access to the three ledgers. The entries in the three ledgers are made in both English and Japanese but they are so laid out that given minimal explanation of the Japanese characters therein, the English entries make it possible for anyone familiar with simple bookkeeping to analyze and recognize what the ledgers portray. The ledgers show that immediately after the April 1960 contract had gone into

2. Collier later made another $5,000 loan to Gates, without interest, payable together with this first $5,000 loan. Gates paid back $1,000 on these two loans.

effect, i. e., beginning May 4, 1960, Gates set up a scheme of embezzlement whereby he falsely and fraudulently reported to Collier the COD and cash sales to Japanese civilians as having been term sales, thus taking for himself not only the full amount of commissions to which he might be entitled but also all of that portion of the sale which became immediately due to Collier. Knowing that Haskins & Sells in Tokyo would periodically send out normal auditing records to term purchasers, the ledger indicated that the names and addresses of the purported "purchasers" on term sales orders, as sent into Collier in New York, were not the true purchasers, but were relatives and friends of Gates and his staff who were given instructions to send any auditors' letters back to GatesCo for answering.

On Friday morning April 27, Gates told Bennett and Van Arsdale that he had concocted this scheme, not the bookkeepers, because he was badly in need of cash and he had used the money to pay Collier the indebtedness of GatesCo (referred to in the April 15, 1960 agreement). He said he intended to reimburse Collier out of property he had in Japan and requested that he be allowed to report all this to the Tokyo representative of the bonding company, himself—and he did so report.

On Tuesday May 1, however, Gates' attitude was different. He said that he had discussed the matter with his lawyer in Japan, and that he had done nothing wrong. He told Bennett that he had no right to be there in Collier's office and no rights to any records, and refused to let Bennett have them.

Meanwhile, Bennett on April 26 had notified the officers of Collier in New York of what was shown by the three ledgers, and at a meeting of the board of directors on that day, Gates was removed from his office of vice-president and supervisor of the Asiatic Division of Collier, and his power of attorney was revoked.

On May 2, by letter Bennett discharged Gates at Collier's office in the GatesCo building. Gates, with his attorney present, refused to allow Bennett to have any of the records in the office. (Bennett had not returned the three ledgers.) On the same day, Bennett moved the Collier office out of the GatesCo building, cancelled Gates' name as Collier's representative in Japan, reregistered the Collier branch under his (Bennett's) and Nork's own names, and issued notices to purchasers that they should not make any further payments to Gates, but rather to Collier at the new location. The preliminary check by Bennett and Van Arsdale indicated shortages and losses of about $180,000. (About the same time Nork, general sales superintendent of Collier, had taken all Collier's records away from the Gates-Foster office in Australia and had taken over the Australian operation.) Also about the same time, almost simultaneously, John Boe, then president of Collier, took away the military accounts by writing to the purchasers that they should pay directly to Collier in the United States.

On June 8, 1962, Gates filed an affidavit with a Tokyo district court claiming that Collier owed him over $132,000; that he had not been properly discharged by the corporation and that he was still representative of Collier in Japan; and that Bennett's actions were ruining his business and his reputation. The affidavit was in support of an application for an ex parte injunction restraining Bennett and Nork from interfering in any way with Gates' business as representative of Collier in Japan. On June 12, 1962, an ex parte order was issued as prayed for. Gates proceeded thereafter to sell 251 sets of the encyclopedias which Collier had theretofore shipped him—without remitting anything to Collier.

Suits also were filed in Japan and Australia by the parties.

In 1963, Gates moved with his wife and children to Hawaii, and in July 1964 filed this diversity action for an accounting in this court, claiming that Collier owed him some $367,000 under

the contracts covering Japan and Australia. Collier counter-claimed, claiming that Gates owed it money for the books furnished him and sold, and also prayed for damages for loss of business in their Asiatic Division, expenses incurred because of Gates' actions, attorneys' fees, and punitive damages.

Gates claims that the contract was not terminated by the two weeks' notice as provided therein until October 15, 1962, and therefore October 15 is the date upon which all commissions due him must be figured.

■■■ This court has already indicated orally from the bench and now states again that the three ledgers (Exs. B13—A, B and C) on their face show that as of May 13, 1960, Gates began embezzling monies due Collier under the first contract and continued such embezzlements until Bennett discharged him as Collier's representative in Japan and took over the business on May 2, 1962. The two weeks' notice provided by the contract was obviously intended to apply to a volunary termination of the contract—without involving any such gross and criminal breach thereof, as found here. By May 2, 1962, Bennett had before him clear and positive proof of Gates' fraud. Bennett's letter of discharge on May 2 and his acts immediately thereafter constituted ample notice to Gates that the contracts were forthwith terminated, and for what reason. Nork's actions in Australia, likewise gave the same notice. Under the factual circumstances, the two weeks' notice referred to in the contract had no application. The breach by Gates was so substantial and fundamental as to completely destroy the personalized foundation of the contracts and negated any possibility of Gates being permitted to continue to run Collier's Japan and Australian operations. Failure to terminate promptly after discovery of Gates' fraud would have waived the breach.[3] All Collier-Gates contracts were terminated as of May 2, 1962.

■■■ Gates took the stand and his hesitancy to answer defendant's and the court's questions, his nervousness, his constant wetting of lips, his reluctance to make any positive statements under cross examination, his repudiation of his own signature until it was conclusively proved to him that he had signed certain documents, his loss of memory regarding transactions until the documents signed by him covering the transactions were presented to him, his denial of facts and events until written proof was shown to him, his steady and repeated equivocal answers to direct questions[4] all lead the court to give little credit to anything he testified to unless corroborated by other and more trustworthy proof. His testimony regarding the three ledgers was calculated to infer that he had no knowledge of what was going on during the two years that the ledgers were kept; that he had no more than casually glanced at the ledgers after they were on Saito's desk, or Allen's desk, in the office; that he had never examined them until Bennett came in April of 1962. Even if his former employee, Saito, had not testified to the contrary, this court would not have believed that anyone running a book-selling business since 1953 would be so ignorant of what was going on in his own and wholly-controlled office. The court fully believes Saito, Bennett and Van Arsdale's testimony that Gates ordered these ledgers set up as they were for the specific purpose of obtaining ready cash—by falsely and fraudulently changing the COD and cash

---

3. 17 Am.Jur., Contracts, § 503.

4. E. g.: (Gates on the stand)
   THE COURT: You answer my question! Did you request it of Collier or not. that you wanted them to have the future payments sent out of Japan and put to your credit in New York. Did you tell them you wanted that?

   GATES: I know that we discussed it.
   THE COURT: Never mind if you discussed it. Did you tell Collier or any representative of Collier that you wanted it?
   GATES: I would say, I must say I guess I did.

orders into term orders and keeping all of the cash for his own use until each term payment became due. Much later on, as the records indicate, even some fictitious term payments were not paid over to Collier when "due".

Plaintiff's counsel offered figures, based upon the gross number of sets sold out of the Japan and Australian offices as of October 15, 1962 (plaintiff's claimed termination date), showing that on the percentage commission basis under the contracts Collier owed Gates some $422,804.98. Plaintiff's calculations were all based upon the assumption that Gates was entitled to 59.5% out of every sale made. (This percentage was but the sum total of all percentages Gates could receive under optimum conditions.)

As the court ruled at the time the argument was made, and as the court indicates herein, all percentages except the first 34% were contingent percentages. Gates was not automatically entitled to any of them. There was also built into the contract by the 12.5% clause a responsibility and liability of Gates for all bad business over 12.5% of the gross sales. Plaintiff's calculations therefor were founded upon percentage figures to which, under the evidence, plaintiff did not show he was in fact entitled. Plaintiff's calculations assumed that Gates had engendered no bad term sales during the period of the contract. As was manifest by the March 1, 1962 agreement, the term sale business had already turned sour, but plaintiff in his calculations completely ignored that fact, as well as his liability under the 12.5% clause, and as shown by the testimony of Allen Rabinowitz, C.P.A. and M.B.A., chief corporation accountant and manager of the accounting control department of Collier, infra, instead of plaintiff having an overall credit due him, the losses on term sales were so bad that the plaintiff became liable to the defendant under the bad business clause of the contracts.

As indicated above, defendant had an exhaustive study of all of the Gates' Japan and Australian accounts made by Rabinowitz. In his calculations, Rabinowitz gave Gates full credit for all sales up to and including May 2, as if Gates had not committed fraud and embezzlement. His calculations, made on a basis most favorable to Gates, showed that out of gross sales of over $1,069,549, Gates' liability under the 12.5% clause for 96B–Military and 97–B–Japan civilian accounts, as well as the 10% liability clause on 99B–Japan schools accounts was $185,822. Only the Australian accounts reflected a credit due Gates on term business. As indicated by the calculations of Rabinowitz, Gates still owes Collier $169,013 under the contracts.

Plaintiff's alternate position is that even so, Gates is not liable to Collier because the contracts, excluding the Australian contract, are void inasmuch as they are in violation of the Foreign Exchange Control of the laws of Japan. The Civil and Commercial Codes of Japan and the Japanese Foreign Exchange and Foreign Trade Control Law were put into evidence.

When it opened its Japan branch, defendant applied for and secured an Import License from the Japanese government as provided by its law and shipped its encyclopedias and accompanying books to its Tokyo branch at a unit price of $172.50 per set, representing for the purposes of the Japanese Import License that such was "the full amount of invoice covering cost of books, payable in U. S. Dollars in twelve (12) equal monthly installments * * *." Payments were made to Collier out of the Tokyo bank account on this basis.

Plaintiff presented three theories upon which he urged the court to find the contracts were void, in that the parties agreed to violate the Japanese Foreign Exchange & Foreign Trade Control Law (J.F.E.):

1. Because the price charged GatesCo by the defendant for similar books prior to the April 21, 1960 agreement was $77.87 per set, FOB Ohio, that figure represented the actual cost (plus, of course, some profit) to the defendant

for its books, and the difference between that figure and the $172.50 could not possibly reflect the true cost of the shipping and additional charges resulting from Collier's shipping the books to itself in Japan under the new contract.

2. The percentages of the gross retail sales price to which Gates could be entitled under the contract was 59.5%, leaving Collier's rights to but 40.5%. Thus, Collier's "cost plus profit" was but $118.31, leaving $54.19 out of the $172.50 to be deposited in dollars to Gates' account in New York (a transfer of funds not allowed under the law).

3. Gates testified that the $172.50 was deliberately fixed by agreement in order that he might be enabled to get the $54.19 transferred out of Japan.

The above claims were denied by the defendant.

The price charged GatesCo prior to the April 1960 contract has no probative effect in sustaining plaintiff's contention as to the cost of Collier's books shipped to Gates under the contracts. The relationship of the plaintiff and defendant at that time was strictly a buyer and seller relationship. All costs and risks of shipment, sales and collection were borne by Gates as the buyer. Even if the evidence had not shown that Collier's costs had increased about the time of the contracts, this court could not find from the evidence that the $77.87 was in any manner relative to proof of Collier's costs per set under the contracts.

■ Nowhere did the plaintiff prove, or even attempt to prove, the actual cost or cost plus profit of any set of books landed and sold in Japan. As stated heretofore, the percentage claimed by plaintiff to represent the respective shares of Gates and Collier in the gross sale price cannot be taken by this court as representing Collier's costs. The only figure which the court can assume as representing Gates' share on every sale was 34%. Gates was entitled to the 7% only when 50% of the purchase price had been paid within 15 months after the order. The 5% was to be paid Gates only for cash sales. The 12.5% was contingent upon the collection loss ratio being less that figure, and the 1% was based upon a certain volume of sales. Thus, every other percentage save the initial sales commission of 34% was a contingent percent. It was manifest to the court from the fact that the percentages were contingent that Collier's costs fluctuated with collections, cash sales and volume. What Collier's costs were under any given hypothesis were never proved by the plaintiff. Furthermore, what Collier's actual costs were on the actual sales made during the contract period were never presented to the court. The plaintiff having failed to show what Collier's true costs were, this court cannot find that the invoice "cost" price of $172.50, even assuming it was so intended, did in fact violate the J.F.E.

■ Plaintiff further urges that the transfer of dollars received from U.S. servicemen on sales to the military and the direct transfer of those dollars out of Japan to New York violated J.F.E., Chapter V "Restrictions and Prohibitions"—Section I "Payments", Article 27 (1) and (2), and Section V "Others", Articles 42 and 45.[5] It would appear

---

5. "Article 27. Unless authorized as provided for in this Law or in Cabinet Order, no person shall in Japan:
    (1) Make any payment to a foreign country;
    (2) Make any payment to an exchange non-resident or receive any payment from an exchange non-resident;
    * * * "
"Article 42. Unless authorized as provided for by Cabinet Order, no person shall contract for services involving payment, settlement or any other transaction governed by the provisions of this Law."
    "Article 45. Unless authorized as provided for by Cabinet Order, no person may export or import means of payment * * * documents embodying rights to claimable assets."
    "Chapter I, Article 6 (Definitions)
    *      *      *      *      *
    (5) 'Exchange residents' shall mean all natural persons who have their permanent place of abode or who customarily live in Japan, and also juridical persons (corporate bodies, enterprises),

from the words of the statute that its terms are broad enough to include these payments. This court is all too familiar with the legal complexity of the problems of construction of statutes.[6] The J.F.E. was first promulgated December 1, 1949. This court takes judicial notice that Americans in military service have been stationed in Japan since 1945 and this court may legally presume that from that time to 1962 that U. S. dollars have been sent out of Japan to the U. S. for purchases by servicemen similar to those involved here. This court likewise can and does presume that there must be Japanese cases or administrative opinions which set out and construe the definitions, restrictions and prohibitions referred to. This court, however, has not been furnished by the plaintiff with any such proof as to whether or not the sections referred to do in fact under the law of Japan prohibit the type of dollar transaction covered here by the sales to the U. S. military. It is impossible for this court to determine the legal application of the broad words of that law to the particular facts of this case, in the absence of proof by Japan case law or administrative opinion.[7]

In this connection, the court notes in the statement of Gates, signed and filed by Gates in the Japanese court on June 8, 1962, in support of his application for an order from the Tokyo District Court restraining Collier from interfering with Gates' sales of Collier's books, Gates stated: "Mr. John Boe, the President of P. F. Collier, Inc., took away Military accounts by writing to customers and have them pay directly to the U.S.A. * * *" The Court also notes that with such information before the Tokyo court, on June 12, 1962, that court did but order Collier not to interfere with "the execution of business by the creditor [Gates], as Representative in Japan of P. F. Collier Incorporated, under the contract as shown by the attached list, particularly the collecting of sales money for the publications from those persons listed under the terms of the said contract." Thus it appears that in 1962 the Japanese court had the pertinent facts before it upon which now Gates urges that the contract was void as in violation of the Japanese law, but plaintiff has made no showing of any action thereon, since that time, by the Japanese government.[8]

having their seat or place of administration in Japan. The branches in Japan (agencies, establishments, etc.) of exchange non-residents are considered to be exchange residents irrespective of whether they are independent in law or not and even if the place of their administration or their headquarters is located abroad.

(6) 'Exchange non-residents' shall mean all persons, natural or juridical, other than those falling under the meaning of exchange residents.

(7) 'Means of payment' shall mean bank notes, Treasury notes, small paper money, coins, checks, bills of exchange, money orders, letters of credit and other orders for payment.

(8) 'Foreign means of payment' shall mean money in foreign currency and other means of payment as specified in the preceding item which are expressed in foreign currency or payable abroad irrespective of the currency in which they are expressed.

     *     *     *     *     *

(13) 'Claimable assets' shall mean time deposits, demand deposits, insurance policies and claims, balances in current account, any claims to be paid such as arising out of loans or bids or any other claims, expressed in terms of money insofar as they are not embodied within the meaning of other items of this Article."

6. Cf. Re Castro, 44 Haw. 455, 355 P.2d 46 (1960)

7. Telesphore Couture v. Watkins, D.C.E. D.N.Y.1958, 162 F.Supp. 727.

8. J.F.E. Chapter VI "Foreign Trade" (Sanction)

"Article 53. The Minister of International Trade and Industry may prohibit any person who, in connection with the export or import of goods, has violated the provisions of this Law, ordinances or measures based thereon, from engaging in export or import transactions for a period not exceeding one year."

As indicated above, plaintiff has not proved the judicial interpretation and legal effect of the Japanese law to the particular facts of this case and this court cannot find that the contract was illegal and void.

■ It is not necessary that this court determine whether Gates was an "employee" of Collier. Certainly he was the agent of Collier for the purpose of receiving and selling the books sent to Collier's Japanese branch. It was also his duty as Collier's agent to see that when the books were sold, the orders and money received for the same were properly accounted for and sent to Collier. Here there was no debtor-creditor relationship, nor was there a bailor-bailee situation. It was never intended that Gates should have title to the books at any time. Title always remained in Collier until delivered by Collier's agent, Gates, to the "customer". When Gates failed to truthfully report and forthwith turn over to Collier its share of the money he received from the COD sales of the books, his acts were the acts of an embezzler—he had violated his fiduciary obligation to Collier.

■ In furtherance of the contracts, Collier shipped 2500 sets of encyclopedias to its Japan branch. As of May 2, 1962, 2248 sets had been sold. One set, at Collier's instruction, had been delivered to a Japanese printer, leaving 251 sets received but unaccounted and unpaid for by Gates. At closing argument Collier admitted that it had never proved that the books normally shipped (and sold) with the sets of encyclopedias were shipped with these 251 sets. The value of the sets of encyclopedias, alone, for J.F.E. permit purposes had been fixed at $153, and Collier stipulated it would accept that sum per set in determining its loss on this particular transaction. The court finds that the reasonable value of the 251 sets of encyclopedias so taken and converted by Gates was $38,403, and the court grants judgment for Collier and against Gates in that sum.

■ Plaintiff urges that any claims for these books is barred by the two-year statute of limitations, § 241–7 R.L.H. 1955:

> "Actions for * * * damages or injury to * * * property shall be instituted within two years after the cause of action accrued * * *.",

and since defendant's counterclaim was not filed until after July 1964, its claim is barred. § 241–7 has no application to the facts of this case. Defendant is not claiming damage or injury to its property, but rather that Gates took the same, which by § 241–1(d) R.L.H. 1955 has a six-year period of limitation.[9]

The court finds the calculations of Rabinowitz to be true and correct and that Gates has been given every credit which would have been his if the contract had been terminated as of May 2, 1962, without fraud. This calculation appears to the court more than Gates deserves, but since Collier asks only for the amount shown in Rabinowitz's calculations, the court grants judgment for Collier and against Gates in the sum of $169,013 on account of the book sales made out of the Japan branch of Collier from April 15, 1960 through May 2, 1962.

The court finds that Collier made two personal loans of $5,000 each to Gates during the period of Gates' two contracts and that Gates had repaid but $1,000 as of May 2, 1962, and has made no payment thereon since. The court gives judgment for Collier and against Gates for that debt in the sum of $9,000.

Defendant also asked for attorneys' fees for all legal services incurred arising out of Gates' fraud, including all litigation arising thereafter. This included the Japan litigation, the Australian litigation, the Hawaiian litigation, and the litigation between Collier and the company which bonded Gates. All of these legal expenses were lumped together and evidence offered by the defendant to prove these fees did not seg-

9. "Actions for taking, detaining * * * any goods or chattels * * *."

regate the fees charged by Collier's attorneys for the several and separate items of litigation nor show counsels' time involved.[10] The court ruled from the bench that the court could not in this case allow Collier any attorneys' fees for the litigation over Gates' bond. The court also ruled that it could not allow Collier any attorneys' fees for the litigation presently pending in Australia. The problem of the attorneys' fees for the bond litigation as well as the Australian litigation are for determination by the courts in which those actions lie, when the same are finally disposed of.

The attorneys' fees for the Tokyo litigation are not in the same category. Due to the time as well as the manner in which that litigation was carried on by the plaintiff herein, defendant had no legal means for securing reimbursement for its attorneys' fees incurred as a result of that action. The court finds the defendant's claim that the action in Japan was brought by Gates for the deliberate purpose of injuring Collier and was without any foundation in truth, in fact, or in law, is true. The court has reviewed the affidavit upon which Gates made his application for the restraining order and after hearing all of the evidence, including the testimony of Gates himself, the court finds that Gates' claims in his affidavit of June 8, 1962, that he was still the representative in Japan of Collier, that the board of directors had taken no action to discharge him as representative, and that Bennett misunderstood Gates' explanation of Japanese business on May 2, 1962, and that the board of directors did not issue a resolution to discharge Gates as a representative in Japan was false, and Gates knew it was false at the time he made the statement. At the time, Gates knew that the board of directors had already taken away all powers from him. The court finds that the Japanese court action was but part of Gates' wilful attempt to implement his fraudulent acts of embezzlement and to postpone the day of reckoning.

Collier claims the following legal expenses resulted from Gates' fraud:

1962—$17,313.54 to Cadwalader, Wickersham & Taft (C.W. & T.).

1963—$6,163.21 to C.W. & T., which fee included payment to attorney Kono of Japan.

1964—$6,297.14 to C.W. & T., which also included a fee to attorney Kono.

1965—$38,318.18 to C.W. & T., which also included a fee to attorney Kono.

$2,511.55 to Robertson, Castle & Anthony of Honolulu for this instant litigation.

1966—$8,267.27 to C.W. & T.

It thus appears through Gates' fraud defendant has paid in attorneys' fees (exclusive of fees paid to Australian attorneys) a total sum of about $78,000. As indicated, defendant was unable to segregate these payments and did not show the time spent by its attorneys. The court is satisfied that the defendant should be awarded some reasonable sum for the services rendered by its attorneys in connection with the Japanese[11] and this Hawaiian litigation only, including the instant trial.[12] Considering the increased complexity of problems arising out of litigation in foreign courts, the peculiar nature of the Japanese litigation, along with the deposition and interrogatory problems evidenced in the record of this case, its complexity, the damages involved here and the time

10. Cf. In re Hudson & Manhattan Railroad Company, 339 F.2d 114 (2d Cir. 1964); Official Creditors' Committee of Fox Markets, Inc. v. Ely, 337 F.2d 461 (9th Cir. 1964).

11. Seaboard Surety Co. v. Permacrete Construction Co., D.C.E.D.Pa., 130 F. Supp. 184, 187, aff'd, 3 Cir., 221 F.2d 366.

12. Gazan v. Vadsco Sales Corp., D.C.E.D. N.Y.1934, 6 F.Supp. 568. Delehanty v. Walzer et al., ·Sup., 59 N.Y.S.2d 777 (1945). See generally, 6 Moore, Federal Practice (2d ed.) Pa. 54.77(a).

spent in this trial, the court finds that the sum of $25,000 is reasonable, and the defendant is allowed attorneys' fees, therefore, in the sum of $25,000, as special costs.[13]

Defendant has also asked for the expenses incurred by Bennett and Nork, directly and proximately caused by Gates' embezzlement. The evidence shows that Bennett's actual and necessary expenses during the April 22–May 20, 1962 trip from New York to Tokyo and return was $3,746.52 and Nork's actual and necessary expenses for the period April 28–August 23, 1962, incurred while traveling from New York to Sydney to Tokyo and back to New York were $7,265.47. The court finds that these were reasonably and necessarily caused by Gates' embezzlement[14] and therefore awards defendant $11,-011.99 as additional damages.[15]

Although defendant has claimed punitive damages, the court has heretofore ruled that for embezzlement and fraud of this nature, the New York law does not permit punitive damages to be awarded.[16]

Under the laws of both the State of New York as well as the State of Hawaii, the statutory rate of allowable interest is six per cent. Collier is entitled to and allowed interest at the rate of six per cent (6%) per annum on the above mentioned sums of $169,013,

$38,403 and $9,000, beginning as of May 2, 1962, until the date of this amended decision—July 6, 1966.

Let judgment be entered in favor of the defendant and against plaintiff in the total of the amounts above indicated, plus costs of this action.

After the court's original decision was filed, defendant moved for an order restraining Gates from disposing of his interest in certain property in Japan. This matter having been heard at the same time as defendant's motion for amendment of the original decision, as well as plaintiff's motion for a new trial, the court finds from Gates' own testimony that practically all of his assets consist of property located in Japan and now under provisional attachments issued by the Tokyo district court involving the same parties and subject matter involved in this case. Upon the judgment in this case becoming final, the matter would appear to be *res adjudicata* in the Japanese courts, whereupon the action in Japan could be dismissed and the liens lifted.

In view of the past criminal record of Gates and his actions in this case, the court finds that Collier has good reason to believe that Gates might attempt to dispose of the Japan property in order to frustrate collection of Collier's judgment hereunder. The court is satisfied that an order restraining Gates from disposing of his interest in his

---

13. North Drive-In Theatre Corp. v. Park-In Theatres, Inc., 248 F.2d 232, 239 (10th Cir. 1957). In re General Stores Corp., D.C.S.D.N.Y. (1958) 164 F.Supp. 130, 146.

14. Krawill Machinery Corp. v. Robert C. Herd and Co., D.C.D.Md. (1957) 155 F. Supp. 296, aff'd, 4 Cir., 256 F.2d 946, aff'd 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed. 2d 820. See, 37 C.J.S. Fraud § 141e—Expenses.

15. Defendant also claimed additional expenses incurred by Nork and other employees between September 30, 1962 and September 28, 1963 in the sum of $15,-774.39 in order to reestablish the Australian and Japanese branches. Defend-

ant has not shown the court that its problems in reestablishing its Australian and Japanese branches would have been or were in any specific manner basically different from that which it would have found if the Gates-Collier contract had been terminated, absent fraud and by the normal two weeks' notice provided for in the contract, and rejects that portion of defendant's counterclaim.

16. Toho Bussan Kaisha Ltd. v. American President Lines, Ltd., 265 F.2d 418, 76 A.L.R.2d 1344 (2d Cir. 1959). Hanlon v. Macfadden Publications (1951), 302 N.Y. 502, 99 N.E.2d 546, 24 A.L.R.2d 733. Sager v. Friedman (1936), 270 N.Y. 472, 1 N.E.2d 971. Reno v. Bull (1919), 226 N.Y. 546, 553, 124 N.E. 144.

property in Japan is necessary and proper and, under the equity powers of this court, it is so ordered.[17]

Counsel for Collier will prepare the necessary judgment and order.

---

17. Lester v. Parker, 235 F.2d 787, 789 (9th Cir. 1956), rehearing denied, 237 F.2d 698; Connolly v. Gishwiller, 162 F.2d 428, 435 (7th Cir. 1947); United States v. Ross, 302 F.2d 831 (2d Cir. 1962).