Ronald E. GATES, Appellant,

v.

P. F. COLLIER, INC., Appellee.

No. 21308.

United States Court of Appeals
Ninth Circuit.

June 14, 1967.

Rehearing Denied July 26, 1967.

Shiro Kashiwa, Kashiwa & Kashiwa, Honolulu, Hawaii, for appellant.

Cadwalader, Wickersham & Taft, New York City, Robertson, Castle & Anthony, Honolulu, Hawaii, for appellee.

Before POPE, BROWNING and DUNIWAY, Circuit Judges.

POPE, Circuit Judge.

An action was brought by the appellant Gates, as plaintiff, seeking recovery of sums alleged to be due him from appellee Collier under the terms of certain contracts between the parties whereby Gates became a sales representative of Collier to sell Collier's encyclopedias in Japan and certain other Far Eastern countries. He was to receive commissions or compensation calculated on the basis of a percentage of the sales prices received.

Gates had been selling these books since 1953 mainly in Japan under various terms and conditions, when in 1960 he was made Far Eastern sales supervisor for Collier with his headquarters in Tokyo. This was by contract dated April 15, 1960. On September 15, 1961 the parties entered into a new agreement which was substantially the same as that of April 15, 1960.

According to Gates' calculations, set forth in his complaint, Collier owed him $422,804.98, for which he sought judgment. Collier filed counterclaims charging Gates with fraud, breach of fiduciary duty and breach of contract. The judgment of the court below was for Collier on these counterclaims in the amount of $306,676.25. Gates then took this appeal from that judgment.

The findings and decision of the district court are reported in Gates v. P. F. Collier, Inc., 256 F.Supp. 204. The facts are extensive and involved. The court there examined at length the claims of the parties, both those in the plaintiff's complaint and in the defendant's counterclaim, and on the basis of those findings concluded that Collier was entitled to judgment against Gates in the sum previously stated. Because of the completeness of these findings, and the ready availability of that reported decision, we shall not undertake here to repeat them.

It is our opinion that the findings of the trial court are not clearly erroneous, and for the reasons hereinafter stated we reject the attacks made upon the trial court's conclusions of law. The judgment should be affirmed for the reasons stated in the decision of the trial court.

The appellant asserts that the agreements entered into between the parties, on the basis of which the court awarded judgment to Collier, were illegal and void both under Japanese law and under New York law because they were in fact the implementation of schemes to avoid and violate the Japanese Foreign Exchange Law and Foreign Trade Control Law. As disclosed in the district court's decision the contract provided for sales of the books to different types of purchasers to be listed in separate accounts calling for distinct and different commissions to Gates. Some of the provisions of the contracts called for sales to Japanese civilians, some to Japan schools, and some to the American military personnel stationed in Japan. With respect to the sales made to Japanese citizens and schools, Collier, at the time of the execution of the 1960 contract and the opening of its Japan branch

thereunder, secured an import license from the Japanese government. In that connection it was represented that the cost per set of books was $172.50. This would permit a remittance to Collier in the United States of $172.50 per set.

■ The claim of the appellant is that this figure was false and inaccurate and was furnished only to accomplish a violation of the Japanese Foreign Exchange and Foreign Trade Control Law, a scheme entered into by both parties. The district court's findings on this point are reported at pages 211–212, 256 F.Supp. The court found that there was no proof to support this claim with respect to the alleged false statement of a cost of $172.50.[1] We have before us nothing to indicate that this finding of fact of the trial court was inaccurate or erroneous.

As the findings show, Gates made a somewhat similar argument with respect to that portion of the contract dealing with sales to the American military personnel in Japan. During the operation of the contract, United States Armed Forces personnel in Japan were billed directly for books received by them and payment was made in dollars direct to New York. No Japanese permits for these payments were obtained. With respect to those transfers of dollars, the trial court, as indicated on page 213 of 256 F.Supp., took judicial notice of the fact that. Americans in the military services had been stationed in Japan since 1945; that the Foreign Exchange and Foreign Trade Control law dated from 1949, and said: "[T]his court may legally presume that from that time to 1962 that U.S. dollars have been sent out of Japan to the U.S. for purchases by servicemen similar to those involved here." The

court then inquired whether there was any ruling by any Japanese authority that these transfers were violations of Japanese law. None having been brought forward the court declined to find that there was any violation here.

■ That the court's conclusion on this point was manifestly correct is plain from the provisions of Article XIX of the Treaty between Japan and the United States signed January 19, 1960, a few weeks prior to the execution of the aforesaid contract between Gates and Collier.[2] Article XIX provides that the Japanese foreign exchange controls shall not be construed "to preclude the transmission into or outside of Japan of United States dollars or dollar instruments representing the official funds of the United States or realized as a result of service or employment in connection with this Agreement by members of the United States armed forces and the civilian component, or realized by such persons and their dependents from sources outside of Japan."

A substantial portion of the district court's decision was based upon its findings that beginning May 4, 1960, Gates set up a scheme of embezzlement "whereby he falsely and fraudulently reported to Collier the COD and cash sales to Japanese civilians as having been term sales, thus taking for himself not only the full amount of commissions to which he might be entitled but also all of that portion of the sale which became immediately due to Collier." (256 F.Supp. 209) The decision of the court discloses the elaborate devices which Gates used to conceal this embezzlement from the auditors acting for Collier. In consequence of this conduct on the part of Gates, which the

---

1. "Furthermore, what Collier's actual costs were on the actual sales made during the contract period were never presented to the court. The plaintiff having failed to show what Collier's true costs were, this court cannot find that the invoice 'cost' price of $172.50, even assuming it was so intended, did in fact violate the J.F.E." (p. 212)

2. This was a treaty relating to "the Status of the United States Armed Forces in Japan." Although the treaty did not become effective until June 23, 1960, the contract must be taken to have been made in view of its imminent effectiveness. There is no showing of any remittances of sums collected from armed forces personnel during the interval after the date of signature.

court refers to as fraud and embezzlement, the court held that Collier was entitled to recover its resultant loss as damages, and this made up a substantial part of the judgment recovered.

The appellant asserts that the court cannot draw any conclusions as to liability based upon embezzlement, fraud or criminal breach of contract without evidence of the substantive law on the subject. In respect to this assertion appellant says that appellee bases its counterclaim on acts which took place in Japan and that the law of Japan applies, but that because no proof was made of the substantive law of Japan, no recovery may be had on account of any such fraud or embezzlement.

There is no basis for holding that the applicable law, so far as the fraud and embezzlement claim is concerned, is that of Japan. Furthermore, even if we were satisfied that according to the rules of conflict of laws the law of Japan should apply, Gates would not be able to urge here his present argument that the judgment should be reversed for lack of proof of that law.

In the first place, appellant's assertion that the substantive law of Japan relating to fraud and embezzlement was not introduced in evidence, is plainly wrong. Counsel for Collier, while steadfastly arguing that the obligations of Gates, both contractual and otherwise, were governed by the law of New York, did present to the court the Japanese statutes which would be applicable to the fraud and embezzlement claims if the law of Japan were the proper choice of law. During the trial the court inquired of counsel for Collier what the Japanese law would provide in such cases. In response, counsel referred to and argued from the civil code of Japan which was introduced and received in evidence and is Exhibit 100 in this case. It was noted by counsel for Collier that the obligations of Gates under the Japanese law would be those defined in the sections relating to "mandate". This was not disputed. We cannot perceive that the application of Japanese law under the civil code of Japan would have required any different result than that reached by the court.[3]

**3.** The sections of the civil code of Japan which were called to the attention of the court at the time mentioned are as follows: (p. 116) "Article 709: A person who violates intentionally or negligently the right of another is bound to make compensation for damage arising therefrom." (The following sections, under the heading of "mandate"): "Article 643. A mandate becomes effective when one of the parties has commissioned the other party to do a juristic act, and the latter has consented thereto.

(Duty of mandatary—care of good manager)

Article 644. A mandatary is bound to manage the affairs entrusted to him with the care of a good manager in accordance with the tenor of the mandate.

(Ibid—report)

Article 645. A mandatary shall, at any time upon demand by the mandator, make report on the condition of the management of the affairs entrusted to him, and upon the termination of the mandate he shall make a full report thereon without delay.

(Ibid—delivery of things received)

Article 646. A mandatary shall deliver to the mandator all moneys and things which he has received in the management of the affairs entrusted to him; the same shall apply to fruits which he has collected.

2. All rights which the mandatary has acquired in his own name on behalf of the mandator shall be transferred to the mandator.

(Ibid—spending money)

Article 647. If a mandatary has spent for his own benefit any money which he ought to deliver to the mandator or which he is to use for mandator's benefit, he shall pay interest thereon as from the day on which he spent it; if there are any further damages, he shall also be liable to compensate therefor." (p. 107).

"(Scope of demand of compensation for damages)

Article 416. A demand of compensation for damages shall be for the compensation by the obligor of such damages as would ordinarily arise from the non-performance of an obligation.

2. The obligee may recover the damages which have arisen through special circumstances too, if the parties had foreseen or could have foreseen such circumstances." (p. 68–69)

■■ Appellant cannot maintain its assertion that the issues are to be determined according to the law of Japan. This is a diversity case and the court below would endeavor to follow the rules prevailing in Hawaii with respect to conflict of laws. Klaxon Co. v. Stentor Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. The parties conceded that there was no Hawaiian decision bearing upon this question of what law governs. Hence the court would be proceeding properly if it undertook to apply the conflict of laws rules generally applied by courts in this country.

The claims of Collier, upon which it recovered here, were based in part upon the contract and in part upon alleged tortious conduct of Gates. If the trial court were to assume that the Hawaiian court would adopt the rules set forth in the Restatement of the law of Conflict of Laws,[4] it might then apply the law of New York. The Restatement, § 332, makes the law of the place of contracting determine the validity, meaning and effect of an agreement. It adopts the rule of *lex loci contractus*. Although the district court's decision recites that Collier signed the contract in New York and Gates signed it in Tokyo, this last clause is incorrect because in answering an inquiry in the court below as to the exact date and place where Gates signed the agreement he responded that the agreement of April 15, 1960, "was signed by the plaintiff at New York City, on or about the 18th day of April, 1960, or thereabouts." [5]

With respect to that portion of Collier's claim which is based on fraud, § 377 of the Restatement recites that "When a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made." Since the loss was sustained in New York through the non-remittance of the sums retained by Gates, that test would indicate that according to the Restatement the claim for fraud and embezzlement would have to be judged by New York law.

Apparently the court assumed that New York law governed; but it is impossible to discover from the decision just why it proceeded as if the issues were to be determined according to that law.[6] For that reason we have undertaken here to inquire whether, assuming the court adopted certain rules and theories of the conflict of laws, any of those hypothetical tests would point to Japanese law as applicable here. We can find none that do so.

4. We note hereafter the dubious standing of that Restatement.

5. Gates' complaint indicates that New York was not only the place of making the contract but the place of performance as well. Count 1 alleged that "On or about October 16, 1962, in New York City, State of New York, defendant was indebted to plaintiff" in a sum stated. His count 2 states that as of October 17, 1962, there "was due and owing at New York by defendant to plaintiff" a sum there stated. His count 3 makes a similar allegation.

6. During the trial an argument arose as to whether, on account of the alleged fraud, Collier might recover punitive damages. Counsel for both parties argued the proposition on the basis that the New York law would govern. The court accepted this in its decision (256 F.Supp. p. 216) for it alluded to and relied upon the New York law in commenting upon punitive damages.

Appellant at the trial urged that performance of the contract was to take place in Japan, yet he conceded that as a part of the performance of his obligation it was his duty "to send a portion of the money to New York."

Also, in arguing that future profits were not recoverable in an action based on fraud and deceit, appellant's counsel cited and relied upon the law of New York. "Mr. Kashiwa: With relation to this type of suit—that is, they maintain fraud and perhaps deceit. Now, in this type of wrong which they claim, documents were sent to New York, representations were made to New York, and so there is a fraud, and deceit-type facts; and I think they maintain under the laws of New York. The laws of New York on fraud and deceit, you cannot recover future profits. This is the law."

We have indicated above that an examination of the original Restatement of the Law of the Conflict of Laws would point to New York as properly controlling here. We do not wish to suggest that the court adopted or followed that Restatement for it cannot be said that the Restatement represents the prevailing rules or the weight of authority. It has been rather completely discredited and students in this field have generally agreed that it is unsound. See Von Mehren & Trautman, The Law of Multi-State Problems, p. 183; Ehrenzweig on Conflict of Laws, pp. 324, 325; Currie, Selected Essays on The Conflict of Laws, pp. 613–614.[7]

A study of the writings on the subject of Conflict of Laws and of many recent court decisions, all of which unite in discrediting the rules of the Restatement, fails to disclose any theory or statement of principles which would call for the application of the law of Japan to the issues in this case, whether sounding in tort or in contract. This rapid, current change in the accepted views respecting conflict of laws is reflected in the decisions of the New York courts which adopt what has been called the "center of gravity" or "grouping of contacts" theory of the conflict of laws.[8] These cases place emphasis upon the law of the place "which has the most significant contacts with the matter in dispute." In Kemart Corporation v. Printing Arts Research Lab. Inc., 269 F.2d 375, 392–393, this court applied what it called the "most significant relationship" rule in determining proper choice of law. An attempt to codify the current prevailing views of the courts upon this subject is to be found in the current tentative draft of the Restatement of Law Second on Conflict of Laws now in the process of study by the American Law Institute. Section 379 of this tentative draft states the general principle to be as follows: "The local law of the state which has the most significant relationship with the occurrence and with the parties determines their rights and liabilities in tort." The proposed Restatement adds a new section, § 379(c), relating to fraud and misrepresentation. That section reads in part as follows: "(2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which has the most significant relationship with the parties and the occurrence and which therefore is the state of governing law: * * *."

The Reporter's comment upon this provision indicates that in determining what state has the most significant relationship with the occurrence, most weight is to be placed upon (a) the place or places where the plaintiff acted in re-

---

7. As stated by Justice Traynor (Law and Social Change In A Democratic Society, 1956 U.Ill.L.Forum 230, 234): "In certain fields, as currently in Conflict of Laws, the wilderness grows wilder, faster than the axes of discriminating men can keep it under control. The concepts in the Restatement have been shattered by the devastating attacks of Cook and Lorenzen, and the compelling logic of the proposition that in the area between the prohibition of the due process clause and the mandate of the full faith and credit clause, local law is supreme, has made it necessary to search for acceptable doctrines to govern the making of exceptions to local law, and serve as the basis of a new and realistic system of conflict of laws. The demolition of obsolete theories makes the judge's task harder, as he works his way out of the wreckage; but it leaves him free to weigh competing policies without preconceptions that purport to compel the decision, but in fact do not. He has a better chance to arrive at the least erroneous answer if the scholars have labored in advance to break ground for new paths. If they have not, he must chop his own way through, however asymmetrically, and hope that scholars will speed their reinforcements to the job in hand."

8. Auten v. Auten, 308 N.Y. 155, 124 N.E. 2d 99, 50 A.L.R.2d 246; Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, 95 A.L.R.2d 1.

liance upon the defendant's representations, and (b), the place where the plaintiff received the representations. If that be the test with respect to the fraud involved in this case, it would mean that New York would be the proper choice in respect to the defendant's tort claims.

It was in New York that Collier received the false representations as Gates mailed his reports respecting these sales to New York. The contract provided that orders for books obtained by Gates were to be forwarded to Collier at its offices in New York, within ten days after the receipt thereof, and Collier had the right to reject any order. Thus it was in New York that Collier received the representations and it was in New York where Collier acted in reliance upon these representations by proceeding to treat them as time or installment sales.

Appellant places much reliance upon an annotation appearing in 50 A.L.R.2d p. 254, which contains the statement that "The law of the place of performance of a contract governs the question whether it has been breached or otherwise terminated or repudiated." There are two reasons here why appellant's citation is not relevant. In the first place, the annotation relates to the choice of law in a suit on a contract. That is the subject matter of the annotation. But Collier's counterclaim was tried upon the theory that it was an action to recover for fraud and embezzlement, an action sounding in tort, not in contract. Another fault to be found with appellant's citation is that the authors of the annotation rely for their statement just above quoted upon section 370 of the old Restatement whose obsolescence and lack of authority is now universally conceded.[9]

If we assume that the trial court proceeded here upon the theory that the New York law governed the issues in the case, it may have arrived at that conclusion by finding that New York was the state which had the most significant relationship with the parties, the

9. It is plain that in the court below Collier's counterclaim was treated as one sounding in tort. The court during the trial alluded to Collier's claim as a claim for fraud and embezzlement. It would be possible to view the allegations of the cross-complaint, particularly those of the second count stated in the answer, as alleging that Gates' misconduct was actually a breach of his employment contract. The allegations are as follows: "Plaintiff breached his employment agreement and the fiduciary duties he owed thereunder. * * * By reason of his false and fraudulent conduct and interference with defendant's business plaintiff has caused * * * defendant * * * to lose profits which they could and would otherwise have made. * * * The old Restatement rule emphasizing the importance of the place of performance has gone by the board. If the counterclaim were to be treated as sounding in contract, the place of performance would no longer be significant. This is recognized in the currently tentative draft concerning conflict of laws contemplated to become a part of the revised Restatement of the Law of Conflict of Laws. The change in the applicable law in such cases, as it is proposed to be reflected in the new Restatement, is explained in the introductory note to the tentative draft No. 6 relating to contracts, as follows:

"The original Contracts Chapter has been changed in four principal ways. First, it no longer says dogmatically that the validity of a contract is governed by the law of the place of contracting. Instead, the governing law is now said to be the local law of the state with which the contract has its most significant relationship (§ 332). * * * Third, the original Restatement made a sharp distinction between matters of validity and matters of performance, specifying that matters pertaining to damages, to sufficiency of performance and to excuse for nonperformance are governed by the local law of the place of performance rather than by that of the place of contracting. This approach has now been abandoned, and in the present draft it is said that all matters of validity and effect are governed by the local law of the state of most significant relationship with the exception of minute details of performance which are still said to be governed by the local law of the place of performance (§§ 346–346d). * * * A further advantage of the present approach is that it makes no sharp distinction, as did the original Restatement, between matters of validity and matters of performance."

occurrences and the contract.[10] There is much to be said in support of such a conclusion. Collier's place of business was in New York; the books were manufactured and produced in New York; the contract between the parties was negotiated in New York; Gates spent some time in New York conducting bargaining sessions there; the contract was executed in New York and signed by both parties there. Under the contract Gates was to forward all orders for books to Collier in New York; when they reached Collier, Collier was permitted to accept or reject them; dollar sales payments were to be sent to New York; other collections would be remitted to New York daily together with executed forms indicating the numbers of the accounts; an "imprest" fund designed to be available to Gates for his commissions and expenses in connection with dollars sales was established in New York; Gates was to send to Collier at New York lists of all checks drawn on this "imprest" fund; Gates sent the false and fraudulent orders and reports to Collier's New York office and Collier there relied on them and suffered loss. The most convincing factor which points to New York as having the most significant relationship to these transactions is that Tokyo was only one of numerous foreign agencies Collier was operating. Its home office in New York directed them all. The company's broad interest generally in establishing foreign markets is plain from the company president's testimony.

■ All that we undertake to state here is that if the court reached its conclusion as to the proper law to be applied by a process of reasoning such as we have just noted, we cannot, on this record, say that its reasoning was erroneous; much less can we arrive at any conclusion that the court was obliged to apply Japanese law.

It should be understood that in making numerous references to the second Restatement now in preliminary draft form, we are not undertaking to assert that the quoted statements represent the established weight of authority in this field of conflict of laws. It, itself, has been criticized by writers in this field.[11] It is no more than an effort by the reporter and his advisors to summarize what he understands to be the current rules upon this subject. What we have said here simply demonstrates that no matter how we try, we cannot find any substantial or established rule which would require the trial court to judge the validity of Collier's counterclaim according to Japanese law.

■ There is no problem in proving the New York laws. Under § 226–1, Revised Laws of Hawaii, 1955, the Hawaii courts may take judicial notice of the laws of another state, and so may a federal court sitting there. Harry L. Sheinman & Sons v. Scranton Life Ins. Co., 3 cir., 125 F.2d 442, 449; Eliscu v. Fiber, 3 cir., 157 F.2d 136, 138.

Another contention made by Gates collides with his first position, noted above, that the contract was void and unenforceable because it was designed to avoid and defeat the Japanese Foreign Exchange and Foreign Trade Control Laws. He claims that notwithstanding the illegality of the contract he is entitled to recover commissions on the sums which he remitted to Collier at New York. His argument is that in making these remittances he enriched Collier and that Collier should be liable to him on quantum meruit for an unjust enrichment.

We need not inquire whether there is any possibility that the law would permit one engaged in a scheme to defraud to recover on quantum meruit, for, as the court's decision and findings show, a study of all the accounts between

---

10. Some authorities, instead of using the expression "most significant relationship" refer to a so-called "center of gravity" theory, or a "grouping of contacts".

11. Ehrenzweig on The Conflict of Laws, supra, p. 351.

Gates and Collier based on what the agreed percentages were, and taking in account the provisions of the contract requiring Gates to make good losses resulting from bad business, Gates still owed Collier nearly $170,000 under such an accounting.

■ The findings show that there are no facts upon which an unjust enrichment could be calculated.

Another dispute between the parties concerns Gates' claims to certain rights under the contracts after the date when Collier's vice-president, on discovery of the fraud and scheme of embezzlement, notified Gates that his interest and rights under the contract had terminated, and certain purchasers had been notified that payments should be made directly to Collier in the United States. The contract provided for termination by either party through the giving of certain notices. Gates asserts that since the contract provided for different accounts or different types of purchasers of encyclopedias, that the contract itself was a divisible one, and that the notice given to him on May 2, 1962, that he was finished, applied only to the termination of some of these accounts, namely, the ones relating to the sales to the Japanese, and that after May 2, 1962, he still retained the right to sell encyclopedias to other persons under separate portions of his contract. He also asserts that a certain decree obtained by him in a Japanese court upheld his right to do so.

This claim relates to some 251 sets of books sold after the May 2d, date. The court held that Gates had obtained the court order by fraud. Gates now challenges that finding. This would appear to be immaterial because admittedly Gates sold the 251 sets of encyclopedias and neglected to pay for them. Collier was therefore entitled to recovery on account thereof.

■ The trial court correctly held, as shown in its decision, that under the circumstances, and in view of Gates' misconduct, the May 2, 1962, letter of discharge was immediately operative, and the contract was thereupon forthwith terminated.

Since we find no error in the trial court's findings and since we agree with its conclusions, the judgment must be and it is affirmed.