**A. A. DIETEMANN, Appellee,**

v.

**TIME, INC., a New York corporation,
Appellant.**

**No. 23096.**

United States Court of Appeals,
Ninth Circuit.

Aug. 23, 1971.

Bennett W. Priest (argued), Allyn O. Kreps, of O'Melveny & Myers, Los Angeles, Cal., for appellant.

Paul M. Posner (argued), A. L. Wirin, Los Angeles, Cal., for appellee.

Before CARTER and HUFSTEDLER, Circuit Judges, and VON DER HEYDT,* District Judge.

HUFSTEDLER, Circuit Judge:

This is an appeal from a judgment for plaintiff in an action for invasion of privacy. Jurisdiction was grounded in diversity. The parties agreed that California law governed. After a court trial plaintiff was awarded $1000 general damages. On appeal we are asked to consider significant questions involving the relationship between personal privacy and the freedom of the press.

The district court's decision is reported in Dietemann v. Time, Inc., 284 F. Supp. 925 (1968). The facts, as narrated by the district court, are these:

"Plaintiff, a disabled veteran with little education, was engaged in the practice of healing with clay, minerals, and herbs—as practiced, simple quackery.

"Defendant, Time, Incorporated, a New York corporation, publishes Life Magazine. Its November 1, 1963 edition carried an article entitled 'Crackdown on Quackery.' The article depicted plaintiff as a quack and included two pictures of him. One picture was taken at plaintiff's home on September 20, 1963,

---

* The Honorable James A. von der Heydt, United States District Judge for the District of Alaska, sitting by designation.

previous to his arrest on a charge of practicing medicine without a license, and the other taken at the time of his arrest.

"Life Magazine entered into an arrangement with the District Attorney's Office of Los Angeles County whereby Life's employees would visit plaintiff and obtain facts and pictures concerning his activities. Two employees of Life, Mrs. Jackie Metcalf and Mr. William Ray, went to plaintiff's home on September 20, 1963. When they arrived at a locked gate, they rang a bell and plaintiff came out of his house and was told by Mrs. Metcalf and Ray that they had been sent there by a friend, a Mr. Johnson. The use of Johnson's name was a ruse to gain entrance. Plaintiff admitted them and all three went into the house and into plaintiff's den.

"The plaintiff had some equipment which could at best be described as gadgets, not equipment which had anything to do with the practice of medicine. Plaintiff, while examining Mrs. Metcalf, was photographed by Ray with a hidden camera without the consent of plaintiff. One of the pictures taken by him appeared in Life Magazine showing plaintiff with his hand on the upper portion of Mrs. Metcalf's breast while he was looking at some gadgets and holding what appeared to be a wand in his right hand. Mrs. Metcalf had told plaintiff that she had a lump in her breast. Plaintiff concluded that she had eaten some rancid butter 11 years, 9 months, and 7 days prior to that time. Other persons were seated in the room during this time.

"The conversation between Mrs. Metcalf and plaintiff was transmitted by radio transmitter hidden in Mrs. Metcalf's purse to a tape recorder in a parked automobile occupied by Joseph Bride, Life employee, John Miner of the District Attorney's Office, and Grant Leake, an investigator of the State Department of Public Health. While the recorded conversation was not quoted in the article in Life, it was mentioned that Life correspondent Bride was making notes of what was being received via the radio transmitter, and such information was at least referred to in the article.

"The foregoing events were photographed and recorded by an arrangement among Miner of the District Attorney's Office, Leake of the State Department of Pubic Health, and Bride, a representative of Life. It had been agreed that Life would obtain pictures and information for use as evidence, and later could be used by Life for publication.

"Prior to the occurrences of September 20, 1963, on two occasions the officials had obtained recordings of conversations in plaintiff's home; however, no pictures had been secured. Life employees had not participated in obtaining the recordings on these occasions.

"On October 15, 1963, plaintiff was arrested at his home on a charge of practicing medicine without a license in violation of Section 26280, California Health and Safety Code. At the time of his arrest, many pictures were made by Life of plaintiff at his home. Plaintiff testified that he did not agree to pose for the pictures but allowed pictures because he thought the officers could require it. Also present were newspaper men who had also been invited by the officials to be present at the time of arrest.

"Defendant contends that plaintiff posed for pictures at the time of his arrest and thus permission was given to take those pictures. As hereinafter pointed out, it is unnecessary to decide whether or not permission was given to take pictures at the time of his arrest.

"Plaintiff, although a journeyman plumber, claims to be a scientist. Plaintiff had no listings and his home had no sign of any kind. He did not advertise, nor did he have a telephone. He made no charges when he attempted to diagnose or to prescribe herbs and minerals. He did accept contributions.

"Life's article concerning plaintiff was not published until after plaintiff was arrested but before his plea on June 1, 1964 of nolo contendere for violations of Section 2141 of the California Business and Professions Code and Section 26280 of the California Health and Safety Code (misdemeanors).

"'* * *

"Defendant's claim that the plaintiff's house was open to the public is not sustained by the evidence. The plaintiff was administering his so-called treatments to people who visited him. He was not a medical man of any type. He did not advertise. He did not have a phone. He did have a lock on his gate. To obtain entrance it was necessary to ring a bell. He conducted his activities in a building which was his home. The employees of defendant gained entrance by a subterfuge."

The district court concluded: "The publication in Life Magazine on November 1, 1963 of plaintiff's picture taken without his consent in his home on September 20, 1963 was an invasion of his privacy under California law for which he is entitled to damages. The acts of defendant also constituted an invasion of plaintiff's right of privacy guaranteed by the Constitution of the United States which would entitle him to relief under Section 1983, Title 42, United States Code." The court awarded $1,000 general damages "for injury to [Dietemann's] feelings and peace of mind." Time appeals from that decision.

█ The appeal presents three ultimate issues: (1) Under California law, is a cause of action for invasion of privacy established upon proof that defendant's employees, by subterfuge, gained entrance to the office portion of plaintiff's home wherein they photographed him and electronically recorded and transmitted to third persons his conversation without his consent as a result of

which he suffered emotional distress? (2) Does the First Amendment insulate defendant from liability for invasion of privacy because defendant's employees did those acts for the purpose of gathering material for a magazine story and a story was thereafter published utilizing some of the material thus gathered? (3) Were the defendant's employees acting as special agents of the police and, if so, did their acts violate the First, Fourth, and Fourteenth Amendments of the Federal Constitution, thereby subjecting defendant to liability under the Civil Rights Act (42 U.S.C. § 1983)?[1] Because we hold that plaintiff proved a cause of action under California law and that the First Amendment does not insulate the defendant from liability, we do not reach the third issue.

Were it necessary to reach the Civil Rights Act questions, we would be obliged to explore the relationship between the defendant's employees and the police for the purpose of ascertaining the existence of the "color of law" element of the Act. Because we do not reach the issue, we can and do accept the defendant's disclaimer that its employees were acting for or on behalf of the police.

█ In jurisdictions other than California in which a common law tort for invasion of privacy is recognized, it has been consistently held that surreptitious electronic recording of a plaintiff's conversation causing him emotional distress is actionable. Despite some variations in the description and the labels applied to the tort, there is agreement that publication is not a necessary element of the tort, that the existence of a technical trespass is immaterial, and that proof of special damages is not required. (*E.g.*, Nader v. General Motors Corp. (1970) 25 N.Y.2d 560, 307 N.Y.S.2d 647, 255 N.E.2d 765 (applying District of Columbia law); Hamberger v. Eastman

---

1. Although the complaint did not initially cite the Civil Rights Act as a foundation of liability, the district court concluded that a claim for relief had been proved un-

der the Act. On appeal plaintiff pressed liability under the Act as an alternative basis for supporting the judgment.

(1964) 106 N.H. 107, 206 A.2d 239; Roach v. Harper (1958) 143 W.Va. 869, 105 S.E.2d 564; McDaniel v. Atlanta Coca-Cola Bottling Co. (1939) 60 Ga. App. 92, 2 S.E.2d 810; *cf.* Pearson v. Dodd, 133 U.S.App.D.C. 279; 410 F.2d 701, cert denied (1969.) 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465).

Although the issue has not been squarely decided in California, we have little difficulty in concluding that clandestine photography of the plaintiff in his den and the recordation and transmission of his conversation without his consent resulting in his emotional distress warrants recovery for invasion of privacy in California.[1a] California began developing a common law privacy tort in 1931 with the decision of Melvin v. Reid, 112 Cal.App. 285, 297 P. 91. Since then, the California Supreme Court has decided a number of privacy cases in some of which there are indications that California would recognize the plaintiff's claim.

The most recent expression is found in Briscoe v. Reader's Digest Ass'n, *supra*, 4 Cal.3d at ——, 93 Cal.Rptr. at 869, 483 P.2d at 37, a privacy action based upon the publication of an article disclosing plaintiff's conviction of a felony 11 years earlier. The court equated the growing acceptance of the right of privacy with

> "the increasing capability of ' * * * electronic devices with their capacity to destroy an individual's anonymity, intrude upon his most intimate activities, and expose his most personal characteristics to public gaze. * * *
>
> "Men fear exposure not only to those closest to them; much of the out-

rage underlying the asserted right to privacy is a reaction to exposure to persons known only through business or other secondary relationships. The claim is not so much one of total secrecy as it is of the right to *define* one's circle of intimacy—to choose who shall see beneath the quotidian mask. Loss of control over which 'face' one puts on may result in literal loss of self-identity (Westin, *supra*, at p. 1023 [Westin, Science, Privacy, and Freedom: Issues and Proposals for the 1970's (1966) 66 Colum.L.Rev. 1003]; *cf.* Fried, Privacy (1968) 77 Yale L.J. 475), and is humiliating beneath the gaze of those whose curiosity treats a human being as an object."

In Gill v. Hearst Publishing Co. (1953) 40 Cal.2d 224, 230, 253 P.2d 441, 444, which denied recovery for invasion of privacy to plaintiffs whose picture was taken in a public market and later published without their consent, the court stressed that the picture had not been "surreptitiously snapped on private grounds, but rather was taken of plaintiffs in a pose voluntarily assumed in a public market place."

Concurrently with the development of privacy law, California had decided a series of cases according plaintiffs relief from unreasonable penetrations of their mental tranquility based upon the tort of intentional inflection of emotional distress. (*E.g.,* Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal.3d 493, 86 Cal.Rptr. 88, 468 P.2d 216; State Rubbish Collectors Ass'n v. Siliznoff (1952) 38 Cal.2d 330, 240 P.2d 282; Fletcher v. Western Nat'l Life Ins. Co. (1970) 10 Cal.App.3d 376, 89 Cal.Rptr. 78.) Although these cases are not direct author-

---

[1a.] It is unnecessary for us to decide whether California will adopt Dean Prosser's analysis of privacy, including his classification of intrusion as a separate tort (Prosser, "Privacy" (1960) 48 Calif.L. Rev. 383; W. Prosser, Torts 832–33 (3d ed. 1964)), or Prosser Bloustein's more expansive concept of the right of privacy (Bloustein, "Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser" (1964) 39 N.Y.U.L.Rev. 962;

Bloustein, "Privacy, Tort Law, and the Constitution: Is Warren and Brandeis' Tort Petty and Unconstitutional as Well?" (1968) 36 Tex.L.Rev. 611), because the facts of this case would expose the defendant to liability under either view. (*See also* Briscoe v. Reader's Digest Ass'n, Inc. (1971) 4 Cal.3d 529, n. 4, 93 Cal.Rptr. 866, 869 n. 4, 483 P.2d 34, 37 n. 4.)

ity in the privacy area, they are indicative of the trend of California law to protect interests analogous to those asserted by plaintiff in this case.

We are convinced that California will "approve the extension of the tort of invasion of privacy to instances of intrusion, whether by physical trespass or not, into spheres from which an ordinary man in plaintiff's position could reasonably expect that the particular defendant should be excluded." (Pearson v. Dodd, *supra,* 410 F.2d at 704.)

Plaintiff's den was a sphere from which he could reasonably expect to exclude eavesdropping newsmen. He invited two of defendant's employees to the den. One who invites another to his home or office takes a risk that the visitor may not be what he seems, and that the visitor may repeat all he hears and observes when he leaves. But he does not and should not be required to take the risk that what is heard and seen will be transmitted by photograph or recording, or in our modern world, in full living color and hi-fi to the public at large or to any segment of it that the visitor may select. A different rule could have a most pernicious effect upon the dignity of man and it would surely lead to guarded conversations and conduct where candor is most valued, *e.g.*, in the case of doctors and lawyers.

The defendant claims that the First Amendment immunizes it from liability for invading plaintiff's den with a hidden camera and its concealed electronic instruments because its employees were gathering news and its instrumentalities "are indispensable tools of investigative reporting." We agree that newsgathering is an integral part of news dissemination. We strongly disagree, however, that the hidden mechanical contrivances are "indispensable tools" of newsgathering. Investigative reporting is an ancient art; its successful practice long antecedes the invention of miniature cameras and electronic devices. The First Amendment has never been construed to accord newsmen immunity from torts or crimes committed during the course of newsgathering. The First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office.[2] It does not become such a license simply because the person subjected to the intrusion is reasonably suspected of committing a crime.[3]

Defendant relies upon the line of cases commencing with New York Times Co. v. Sullivan (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 and extending through Rosenbloom v. Metromedia, Inc. (1971) 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296[4] (1971) to sustain its contentions that (1) publication of news, however tortiously gathered, insulates defendant from liability for the antecedent tort, and (2) even of it is not thus shielded from liability, those cases prevent consideration of publication as an element in computing damages.

As we previously observed, publication is not an essential element of plaintiff's cause of action. Moreover, it is not the foundation for the invocation of a privilege. Privilege concepts developed in defamation cases and to some extent in privacy actions in which publication is

---

**2.** In this respect the facts of this case are different from those in Pearson v. Dodd, *supra,* 410 F.2d 701. In *Pearson,* the defendant received documents knowing that they had been removed by the donor without the plaintiff's consent. But the donor was not the defendant's agent, and the defendant did not participate in purloining the documents.

**3.** Because we have accepted defendant's disclaimer that it was acting for or on behalf of the police, we have no occasion to consider the impact of the Fourth and Fourteenth Amendments on the relationship between the exclusionary rules in criminal cases and substantive law in a private tort action.

**4.** *E. g.,* Time, Inc. v. Hill (1967) 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456; Associated Press v. Walker (1967) 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094; Curtis Pub. Co. v. Butts (1967) 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094.

an essential component are not relevant in determining liability for intrusive conduct antedating publication. (*Cf.* Nimmer, "The Right to Speak From Time to Time: First Amendment Theory Applied to Libel and Misapplied to Privacy" (1968) 56 Calif.L.Rev. 935, 957.) Nothing in *New York Times* or its progeny suggests anything to the contrary. Indeed, the Court strongly indicates that there is no First Amendment interest in protecting news media from calculated misdeeds. (*E. g.*, Time, Inc. v. Hill, *supra*, 385 U.S. at 389–390 and 384 n. 9.)

No interest protected by the First Amendment is adversely affected by permitting damages for intrusion to be enhanced by the fact of later publication of the information that the publisher improperly acquired. Assessing damages for the additional emotional distress suffered by a plaintiff when the wrongfully acquired data are purveyed to the multitude chills intrusive acts. It does not chill freedom of expression guaranteed by the First Amendment. A rule forbidding the use of publication as an ingredient of damages would deny to the injured plaintiff recovery for real harm done to him without any countervailing benefit to the legitimate interest of the public in being informed. The same rule would encourage conduct by news media that grossly offends ordinary men.

The judgment is affirmed.

JAMES M. CARTER, Circuit Judge (concurring and dissenting).

I concur in all of the majority opinion except that portion refusing to meet the issue of the liability of defendants' agents, acting as agents of the police. The opinion states:

"(3) Were the defendant's employees acting as special agents of the police and, if so, did their acts violate the First, Fourth, and Fourteenth Amendments of the Federal Constitution, thereby subjecting defendant to liability under the Civil Rights Act (42 U.S.C. § 1983)? Because we hold that plaintiff proved a cause of action under California law and that the First Amendment does not insulate the defendant from liability, we do not reach the third issue."

The complaint stated a cause of action under claim of diversity jurisdiction. 28 U.S.C. § 1332. No contention was made that a cause of action was stated under the Civil Rights Act, 42 U.S.C. § 1983. I agree we should not reach any issue under the Civil Rights Act, but think we should reach and decide the issue as to Time's liability for the acts of its employees, as agents of the police, in view of Time's reliance on Fourth Amendment cases.

The district court found that an agreement had been entered into between Life magazine, owned by Time, Inc., and the District Attorney's office in Los Angeles, for Life's agents to acquire information which would be used against Dietemann in a criminal prosecution and published by Life. Dietemann v. Time, Inc., 284 F.Supp. 925, 927. It thus appears that the agreement constituted Life and its employees agents of the police. Time in its appellate briefs, disclaimed any contention that its employees were acting for or on behalf of the police and for this reason the majority refused to reach the issue of the liability of Time for the acts of its employees, as agents for the police.

This issue was briefed extensively below, and but for the disclaimer, is still in the case. Time cited the criminal cases involving the Fourth Amendment, referred to *infra*.

These were cases arising in the United States courts, involving the surreptitious monitoring or recording of conversations and activities of defendants by police and police agents, in which the Supreme Court considered contentions that the conduct violated the Fourth Amendment. On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed.1270 (1952); Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462

(1963); Lewis v. United States, 385 U. S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); Hoffa v. United States, 385 U. S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) and United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). The Supreme Court held that in the situations involved in the cases, there was no violation of the Fourth Amendment, except in Katz. *White* sustained the continuing validity of *On Lee, Lopez, Lewis* and *Hoffa.* It did not cite *Osborn* and distinguished *Katz.*

The above cases all concerned restrictions on federal action under the Fourth Amendment, but Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) held in substance that all evidence obtained by searches and seizures in violation of the United States Constitution is inadmissible in a criminal trial in the State court, and thus incorporated the scope of the Fourth Amendment within the Fourteenth.

It does not follow that, if the intrusion in the case at bar by police agents, did not violate the Fourth Amendment, as incorporated into the Fourteenth, that there can be no civil liability for the intrusion.

A State constitutionally has power to provide protection for the right to privacy. In Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) the Court stated, "But the protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States." [pp. 350–351, 88 S.Ct. p. 510] [Emphasis in text].

Justice Harlan in a concurring and dissenting opinion in Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 stated, "The power of a State to control and remedy such intrusion ['upon * * * solitude or private affairs in order to obtain information for publication'] for news gathering purposes cannot be denied, cf. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, * * * ". [p. 404, 87 S.Ct. p. 550].

Justice Fortas, dissenting in Time, Inc. v. Hill, supra, stated, "Privacy, then, is a basic right. The States may, by appropriate legislation and within proper bounds, enact laws to vindicate that right. Cf. Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949), sustaining a local ordinance regulating the use of sound trucks; and Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), sustaining a state law restricting solicitation in private homes of magazine subscriptions." [p. 415, 87 S.Ct. p. 556].

Justice Brennan, writing for the Court in Time, Inc. v. Hill, supra, took care to state in footnote 9, p. 385, 87 S. Ct., p. 541, "Nor do we intimate any view whether the Constitution limits state power to sanction publication of matter obtained by an intrusion into a protected area, for example, through use of electronic listening devices."

A State is free to reassess the interests involved and reach results that restrict the activities of state police to a greater extent than do the decisions of the Supreme Court. The Fourth Amendment, incorporated into the Fourteenth Amendment by *Mapp*, says only that the police cannot engage in certain activities. It does not dictate that the police be given the privilege to engage in activities it does not prohibit.

A state must enforce the federal exclusionary rules in a criminal prosecution because of Mapp v. Ohio, supra. But a State court can also enforce the additional restrictions it would impose on the police, by recognizing a private right of action for intrusion by the victim of police activity even if the activity does not violate the Fourth Amendment. In fact, a State might recognize a civil action for intrusion when it would not exclude evidence in a criminal prosecu-

tion because of the intrusion. The rationale would be that an unsuccessful prosecution is too high a social price to pay to deter the police.

Various conflicting interests would be weighed by a State court in arriving at a decision as to whether it would allow the cause of action involved in this case. Certain interests that cut toward restricting police activities, include the interest of citizens in privacy, the interests of preventing the police from violating the societal norms of what constitutes fair play and the interest in preventing behavior by the police which could cumulate in tyranny. The primary interest that cuts the other way, is that of society in discovering and successfully prosecuting criminal activities.

There is a basis however for believing that in spite of Life's agreement with law enforcement officers, law enforcement interest was not furthered by the intrusion. *Time admits* [appellant's reply brief p. 16] *that the intrusion was conducted primarily for its benefit.* The law enforcement officers had already on two occasions obtained recordings which should have been sufficient for a prosecution. When allied with the police in making intrusions, the press can serve its private purpose without the public prosecution interest being served.

There is a risk that an intrusion from such an alliance between press and police would not further the public prosecution interest, if the press were allowed to decide *when* the alliances were formed and *when* the intrusion should take place.

Here Time, through its publication Life, realizing it could not unilaterally invade Dietemann's house and privacy, sought the protection of cooperation with state officials. The officials, recognizing their duty not to publicly expose the results of police investigations, accepted the services of Life. Each thereby achieved jointly which neither could have achieved separately.

No California case has expressly considered the existence of a cause of action for an invasion of privacy by an intrusion by either private persons or police agents. We are therefore required to place ourselves in the position of the highest California court considering the matter initially. United States v. Hayes (9 Cir.1966) 369 F.2d 671; Edwards v. American Home Assurance Company (9 Cir.1966) 361 F.2d 622; *See* Gates v. P. F. Collier, Inc. (9 Cir.1967) 378 F.2d 888, cert. denied 389 U.S. 1038, 88 S.Ct. 774, 19 L.Ed.2d 827 (1968); 1 Barron & Holtzoff, Fed. Practice and Procedure, § 8, p. 40 (1960).

California Supreme Court cases in the general privacy realm have suggested a sensitivity to protecting "the right to be let alone." Gill v. Curtis Publishing Co., 38 Cal.2d 273, 275, 239 P.2d 630, 632 (1952). In denying recovery for the publication of a photo taken in the Los Angeles Farmer's Market, the court noted that a different result might have occurred if the picture had been "surreptitiously snapped on private grounds." Gill v. Hearst Publishing Company, 40 Cal.2d 224, 230, 253 P.2d 441 (1953).

Recently the court authored a right to financial privacy in invalidating a financial disclosure statute for public officials. Carmel-By-The-Sea v. Young, 2 Cal.3d 259, 85 Cal.Rptr. 1, 466 P.2d 225 (1970). *See* Briscoe v. Reader's Digest Ass'n (1971) 4 Cal.3d 529, 93 Cal.Rptr. 866, 869, 483 P.2d 34, 37, where the court discusses the right of privacy and "the increasing capability of * * * electronic devices" to interfere therewith.

Based on the above considerations, and the California cases cited by the majority, we believe that California would recognize a cause of action for intrusion against Time for the activities of Life's employees as agents of the police.

This case presents a proper vehicle for that determination. The issue has been extensively briefed and argued below. The issue should be here decided and not avoided.