KATHLEEN RAFFERTY ET AL. *v.* HARTFORD COURANT COMPANY

SUPERIOR COURT          JUDICIAL DISTRICT OF          FILE NO. 028202
                                LITCHFIELD

Memorandum filed March 10, 1980

*Michael Zawadzkas,* for the plaintiffs.

*Alcorn, Bakewell & Smith,* for the defendant.

NORRIS O'NEILL, J. The plaintiffs, each having been recently divorced from their respective spouses, had a joint party at which was held a mock "unwedding" ceremony. The purpose of the party would appear to have been to celebrate their "freedom" from marriage. The location of the party was

private, but on an open hill at some distance from any passersby. The plaintiffs came in peculiar garb and some of the guests dressed a bit oddly.

Among those present were one of the defendant's news photographers and one of its reporters. Neither had been invited. The photographer took pictures. The reporter took notes. The defendant published a picture and a story that would appear in general to be an accurate reflection of the happening. No permission was granted for the publication of the story. The plaintiff Webster claims that he had to leave his job as a result of the "adverse publicity."

The defendant newspaper moves for summary judgment and submits four affidavits, the plaintiffs' answer to the defendant's interrogatories dated November 9, 1978, and its own sworn response to the plaintiffs' interrogatories, dated December 6, 1978. The defendant also submits its own unsworn response to the plaintiffs' request for production dated December 6, 1978. The court has not considered the last document. Practice Book, 1978, § 380.

The plaintiffs' complaint is for invasion of privacy in three counts. The first count alleges an invasion of privacy or intrusion; the second, publication of the fruits of the invasion of privacy; and the third, using those fruits to place the plaintiffs in a false light.

The plaintiffs claim that they were affected by the defendant's articles and that the articles caused them to undergo "extreme mental anguish." The pleadings are closed.

The plaintiffs' affidavits support an intentional physical intrusion by the defendant's employees upon the private affairs or concerns of the plain-

tiffs. Restatement (Second), Torts § 652B. Whether that intrusion is "highly offensive to a reasonable person" is for a jury to decide, but from the affidavits it might be.

Although one who "acts the fool" before others cannot complain if they laugh; it is one thing to perform for friends and quite another for the public. The plaintiffs' affidavits make it clear that they thought their behavior was to be viewed privately. It is well known that acts which are privately funny may in public appear bizarre and weird because they are not viewed through a warming lens of friendship. *Dietemann* v. *Time, Inc.*, 449 F.2d 245 (9th Cir.).

The publicity here could be found to be highly offensive to a reasonable person and not necessarily of any concern to the public. Restatement (Second), Torts § 652D. If, however, the information was obtained fairly and legitimately it might be considered to be of some minor concern to some minor part of the public. It is "news" in the newspaper sense of the word. Except for the divorce records, nothing contained in the article is part of any public record. Restatement (Second), Torts § 652D, comment d.

The plaintiffs claim that the material for the newspaper story was not obtained fairly and thus that the public has no legitimate concern with it. It is not of "significant public interest" which, *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29, suggests, would make it privileged. "The 'public or general interest' test for determining the applicability of the *New York Times* [v. *Sullivan*, 376 U.S. 254] standard to private defamation actions inadequately serves both of the competing values at stake." *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 346. This court will not use that test.

Although in recent years some elements have presented a theory of a public "right to know," logically there can be no such right. That concept implies the infusion of knowledge into the public mind. In fact, what the public has is a "right to find out." That right is not absolute. The public has no right, for example, to break into a private home to see what pictures are on the wall, or to peek into a voting booth to see how someone votes. A newspaper can, at best, claim only to be one of the public. It has the same "right to find out" as the rest of the public. It has the same right to publish as the rest of the public. It has no greater right to intrude to obtain information than each citizen has because each citizen has the same right to publish.

In *Time, Inc.* v. *Hill,* 385 U.S. 374, Justice Brennan seems to suggest that the press and the public are two different entities. There is no historical legal justification for such a position. In fact, such a posture would seriously threaten the freedom of the press that the United States constitution has so long protected. If "the press" is a separate entity, then it must be identified. In the identification alone certain restrictions will necessarily creep in by way of the definition.

If "the press" is defined to be less than the entire public and it becomes so identified, could it then be licensed so that others might not intrude on its special prerogatives? And would the "rest of us" then be limited in what we could publish?

There is no entity that is "the press"—there is only "all of us." See *State* v. *Pape,* 90 Conn. 98, 102. Freedom of the press is the freedom of each person individually, collectively, jointly, severally, in partnership or corporation, by pen, photostat or computer to publish what will be subject only to law.

Just as war is too important to be left to generals so is the right to publish too important to be left solely to professional media sellers.

Freedom of the press under the constitution means the absence of restraint upon publication in advance. *Near* v. *Minnesota,* 283 U.S. 697, 713, 735. It does not relate specially to "the press," meaning the media community. It simply means that each person can publish whatever he wishes subject thereafter to a charge of libel if one is appropriate.

The unauthorized publication of private matters unfairly or unlawfully obtained can be punished. *Dietemann* v. *Time, Inc.,* 449 F.2d 245 (9th Cir.); *Prystash* v. *Best Medium Publishing Co.,* 157 Conn. 507; *Korn* v. *Rennison,* 21 Conn. Sup. 400; *Gill* v. *Curtis Publishing Co.,* 38 Cal. 2d 273.

The common law can protect "any intrusion upon the [plaintiffs'] solitude or private affairs in order to obtain information for publications." *Time, Inc.* v. *Hill,* 385 U.S. 374, 404 (concurring and dissenting opinion of Harlan, J.). Freedom of the press is not absolute. *Beauharnais* v. *Illinois,* 343 U.S. 250; *Patterson* v. *Colorado,* 205 U.S. 454, 462.

A person invades another's privacy when he gives publicity to the other that places him in a false light, if the false light would be highly offensive to a reasonable person and if the actor knew or should have known that either the matter itself or the light were false. Restatement (Second), Torts § 652E.

The plaintiffs have not produced any facts which would support a finding that the facts reported were false. On the other hand, although the defendant has produced a substantial body of evidence, that evidence could not support a finding that the defendant's article was true and accurate.

Because this is not a question of motive, intent or subjectivity, summary judgment would be an appropriate remedy. *United Oil Co.* v. *Urban Redevelopment Commission,* 158 Conn. 364. The question would be whether the facts reported were true. Since no material facts were presented on that question, a dispute as to the truth or falsity still exists. The moving party has the burden of showing the nonexistence of an issue. *State ex rel. Commissioner for Higher Education* v. *Wethersfield School of Law, Inc.,* 169 Conn. 171.

The story could be considered highly offensive to a reasonable person.

The defendant claims that by their actions the plaintiffs became public figures. That conclusion is certainly in dispute. In *Rosenbloom* v. *Metromedia, Inc.,* 403 U.S. 29, a man of considerable stature as a lawyer, author, lecturer and participant in matters of public import was held not to be a public figure.

Even if the plaintiffs are not public figures, they may have to prove actual malice in order to succeed. *Time, Inc.* v. *Hill,* 385 U.S. 374, 389. Again, the issue of actual malice, like the issue of truth, has not been raised by the defendant in its factual offerings. Moreover, "[t]he full extent of the authority of [*Time, Inc.*] . . . is presently in some doubt." Restatement (Second), Torts § 652E, comment (d); *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323.

The defendant would seem to claim an absolute right to publish. In *Smith* v. *California,* 361 U.S. 147, 155, Justice Black, in his concurring opinion, goes a long way toward supporting that position.

That freedom of the press is not absolute has since been affirmed in *Gertz* v. *Robert Welch, Inc.,* supra, where a history of the struggle of nearly a

decade to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the first amendment is set forth.

The principal issue in *Gertz* was whether a newspaper which publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege as a defense to liability for injury inflicted by those statements. The court in *Gertz* said (p. 340) that there is no constitutional value in false statements of fact.

*Gertz* then goes on to distinguish *New York Times* v. *Sullivan*, 376 U.S. 254, and *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130, because the plaintiffs involved in those two cases were, respectively, a public official and a public figure and (1) public officials and public figures usually enjoy significantly greater access to the channels of effective communication; (2) a person who seeks public office in a sense invites comment; and (3) those classified as public figures stand in a position similar to public officials. The court then stated that it cannot be assumed that private individuals invite comment, and specifically held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Gertz* v. *Robert Welch, Inc.,* supra, 347.

"In our view fairly defined areas of privacy must have the protection of law if the quality of life is to continue to be reasonably acceptable." *Virgil* v. *Time, Inc.*, 527 F.2d 1122, 1128 (9th Cir.).

"Libel of an individual was a common-law crime, and thus criminal in the colonies. Indeed, at common law, truth or good motives was no defense. In the

first decade after the adoption of the Constitution, this was changed by judicial decision, statute or constitution in most States, but nowhere was there any suggestion that the crime of libel be abolished." *Beauharnais* v. *Illinois,* 343 U.S. 250, 254–55.

In order to determine this whole issue it is not necessary to go back to Genesis as was done in some law review articles. See, e.g., 31 Law & Contemp. Prob. 272. But in Ecclesiastes 7:1 it is said, "A good name is better than precious ointment." The history of our interest in protecting a person's "good name" is important to an understanding of the law.

Shakespeare probably said it best: "Good name in man and woman, dear my lord is the immediate jewel of their souls: Who steals my purse steals trash; 'tis something, nothing 'twas mine, 'tis his and has been slave to thousands: But he that filches from me my good name robs me of that which not enriches him and makes me poor indeed." Shakespeare, Othello, Act III, Scene 3.

In New England for some 339 years privacy has been cherished. "No man's life shall be taken away, no man's honour or good name shall be stayned . . . nor any way indammaged under colour of law or countenance of Authoritie, unlesse it be by vertue or equitie of some expresse law of the Country waranting the same, established by a general Court and sufficiently published, or in case of the defect of a law in a partecular case by the word of God." Liberties of the Massachusets Collonie in New England (1641).

In Some Fruits of Solitude, William Penn expressed some of man's deepest yearnings when he said: "It is the Advantage little Men have upon

them; they can be Private, and have leisure for Family Comforts, which are the greatest worldly Contents Men can enjoy.

"But they that place Pleasure in Greediness, seek it there: And we see Rule is as much Ambition of some Natures, as privacy is the Choice of others."

And again he said in A Private Life: "Private Life is to be preferr'd; the Honor and Gain of pub-lick Posts, bearing no proportion with the Comfort of it. The one is free and quiet, the other servile and noisy. . . ."

Many years have gone by since that was written. The language has changed, and even the methods of approaching the problem of privacy have been altered. But the need remains.

Privacy at some level is so important to a human being that when it is forcibly withdrawn from a person for an extended period of time that individ-ual will demonstrate psychological damage. "Some Psychological Aspects of Privacy", 31 Law and Contemp. Prob. 307.

At the time of the adoption of the United States constitution some state constitutions were already in place. When Connecticut adopted a constitution in 1818 it specifically recognized that libel might be made a crime. Constitution of 1818, art. I, § 7.

Connecticut's early statutes recognized both the right to print and publish and the restriction of that right, in regard to defamatory material. Acts and Laws, 1786, pp. 133–34. That same ancient volume on its very first page sets forth "An Act Containing an Abstract and Declaration of the Rights and Privileges of the People of this State, and securing the same . . . that no man's life shall be taken away: No man's Honor or Good Name shall be stained . . . unless clearly warranted by the Laws of the State."

In January, 1698, a Connecticut law was passed that a peace bond could be required from "such as invent and sow false reports whereby discord ariseth or may arise among neighbors . . . ; also against idle persons, drunkards, libellers and against such like offenders." Statutes, 1808, pp. 545, 546. That was still the law here in 1783.

"The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized men." *Olmstead* v. *United States,* 277 U.S. 438, 478 (dissenting opinion).

In *Mapp* v. *Ohio,* 367 U.S. 643, the court held that the "Fourth Amendment's right of privacy" is enforceable against state governments in their efforts to prosecute crime. That there is a clear right to privacy under the federal constitution is laid out in detail in *Roe* v. *Wade,* 410 U.S. 113, 152–53.

What good are all of a person's "rights" and their extensions as assured in such cases as *Miranda* v. *Arizona,* 384 U.S. 436 (right to remain silent); *Griffin* v. *California,* 380 U.S. 609 (freedom from comment on failure to testify); *Gideon* v. *Wainwright,* 372 U.S. 335 (right to counsel); and *Mapp* v. *Ohio,* supra; if his reputation can be destroyed with impunity? Once the wall of privacy is breached one's whole house of rights can crumble including most particularly the freedom to associate with others and to organize to promote one's own ideas.

That there is a right to associate with whom one will has been clearly established. *NAACP* v. *Alabama,* 357 U.S. 449. The right to privacy in those associations was made evident when the court said (p. 462) in an unanimous decision: "This court has recognized the vital relationship between freedom to associate and privacy in one's associations."

In speaking of the privacy of marriage, Justice Douglas said: "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions." *Griswold* v. *Connecticut,* 381 U.S. 479, 486.

The plaintiffs here would appear to take a different view of marriage, or, at least in private, they treated the subject with levity and not sententious platitudes. Are they to be subjected to ridicule for their private views, privately expressed? That a Supreme Court justice thinks marriage is a wonderful and valuable institution does not make it immune from criticism, jokes and even nasty innuendo. Are the plaintiffs' private thoughts to be exposed so that they may be suppressed in the future? Such a result would have a chilling or freezing effect not just on words but on action.

Under *Griswold* v. *Connecticut,* supra, what two married people do in private is no one else's business unless they choose to make it such. In like manner, the actions of the plaintiffs here may be found to be no one else's business.

It is the same First Amendment under which the defendant claims its defense that also gives to the

plaintiffs the right to be free from invasion of their privacy. *DeGregory* v. *New Hampshire,* 383 U.S. 825, 829.

The defense that the defendant urges is relatively new to the law. Certainly it does not seem to have been inspired by any case prior to this century or possibly even the last half of this century. See, e.g., *Lyman* v. *New England Publishing Co.,* 286 Mass. 258, where such a defense was never mentioned, although, given the argument in the current case, it certainly would have been logical to have done so.

Libel, slander and defamation suits have been in Connecticut courts for a long time. *Austin* v. *Hanchet,* 2 Root 148; *Leister* v. *Smith,* 2 Root 24. They are still permitted. *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323. Libel of an individual was and is a common-law crime. *Beauharnais* v. *Illinois,* 343 U.S. 250. In fact, the defendant itself recognizes that everyone is responsible for "the abuse of" the liberty "to publish his sentiments." See "A Punishable Slur," Hartford Courant (Editorial), February 19, 1980.

In the present case many facts are disputed. The named plaintiff's affidavit places in dispute whether the defendant was invited and whether there was either a specific or a tacit agreement that the story could be reported. She says: "It was definitely agreed by all in attendance that the party was not to be reported by Bergmann nor anyone else." Bergmann was the defendant's reporter who was in attendance when the agreement was made.

There are too many material facts that are disputed.

In *United Oil Co.* v. *Urban Redevelopment Commission,* 158 Conn. 364, 375–76, the court said: "Generally speaking, summary judgment procedure is an

attempt to dispose of cases involving sham or frivolous issues in a manner which is speedier and less expensive for all concerned than a full-dress trial. . . . It is, however, ill adapted to cases of a complex nature or to those involving important public issues, which often need the full exploration of trial. . . . It is also well recognized that summary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions."

The language quoted above is particularly appropriate to this case because the defendant, in its very thorough brief, raises many issues of great public concern about individual rights of privacy and the right of the public to attempt to find out those things with which the public is legitimately concerned.

The quoted language is also of importance in relation to the present matter because the questions of motive and intent in the extension of the invitation to Bergmann, the question of Bergmann's fair and honest but subjective feelings and reactions to the invitation, the reactions of all parties and witnesses at the ceremony itself, and the overall intent of the plaintiffs are impossible to weigh and to determine on the basis of the simple papers produced as a part of a lawsuit. These matters cannot be fairly sorted out on a motion for summary judgment, but require a full trial.

The motion for summary judgment is, accordingly, denied.